

2001 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

3-27-2001

# Quick v. National Lab.Rel. Board

Precedential or Non-Precedential:

Docket 99-4043

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_2001

Recommended Citation

"Quick v. National Lab.Rel. Board" (2001). *2001 Decisions.* Paper 61.
http://digitalcommons.law.villanova.edu/thirdcircuit_2001/61

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 2001 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

Filed March 27, 2001

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

Nos. 99-4043/00-3032

PATRICK QUICK,

     Petitioner No. 99-4043

v.

NATIONAL LABOR RELATIONS BOARD,

     Respondent

GRAPHIC COMMUNICATIONS
INTERNATIONAL UNION LOCAL 735-S,

     Intervenor
(See Clerk Order dated 2/18/00)

NATIONAL LABOR RELATIONS BOARD,

     Petitioner No. 00-3032

v.

GRAPHIC COMMUNICATIONS
INTERNATIONAL UNION LOCAL 735-S,

     Respondent

PATRICK QUICK,

     Intervenor
(See Clerk Order dated 2/18/00)

Application for Enforcement of a Final
Order of the National Labor Relations Boar d
and a Petition for Review of an Order and
Decision of the National Labor Relations Boar d
(Case No. 4-CB-7981)

Argued: July 13, 2000

Before: SCIRICA and McKEE, Circuit Judges,
and ACKERMAN, District Judge.*

(Opinion Filed: March 27, 2001)

        LEONARD R. PAGE, ESQ.
        General Counsel
        LINDA SHER, ESQ.
        Associate General Counsel
        AILEEN A. ARMSTRONG, ESQ.
        Deputy Associate General Counsel
        DAVID A. FLEISCHER, ESQ.
         (Argued)
        Senior Attorney
        FREDERICK C. HAVARD, ESQ.
        National Labor Relations Board
        1099 14th Street, N.W.
        Washington, D.C. 20570
Petitioner in No. 00-3032
Respondent in No. 99-4043

        IRA H. WEINSTOCK, ESQ.
        JOSEPH P. MILCOFF, ESQ. (Argued)
        Ira H. Weinstock, P. C.
        800 North Second Street
        Harrisburg, PA 17102
Attorneys for Graphic
Communications
International Union Local 735-S
Respondent in No. 00-3032
Intervenor Respondent in
No. 99-4043

_____

*The Honorable Harold A. Ackerman, Senior United States District
Judge for the United States District Court for the District of New Jersey,
sitting by designation.

2

W. JAMES YOUNG, ESQ. (Argued)
National Right to Work Legal
Defense Foundation, Inc.
8001 Braddock Road, Suite 600
Springfield, VA 22160
Attorney for Patrick Quick,
Petitioner in 99-4043
Intervenor in 00-3032

OPINION OF THE COURT

McKEE, Circuit Judge.

We are asked to decide if a "union security clause" in a collective bargaining agreement r equired an employee in a purported "union shop" to continue paying any union dues after he resigned from the union. If we determine that the obligation to pay dues ceased, we must then decide if the employee has standing to seek review of an or der of the National Labor Relations Board ("NLRB") denying attorney's fees for defending against the labor union's state court action to recover "delinquent" dues under the circumstances here. As a subset of that inquiry we will discuss whether the National Labor Relations Act ("NLRA") authorizes the NLRB to award attorney's fees to a non-profit corporation that provided fr ee legal services to the employee.

For the reasons that follow, we hold that the disputed clause allows employees to stop paying all union dues upon resignation from the union. We also hold that the employee has no standing to challenge the NLRB's refusal to award attorney's fees in connection with the union's state court action because the employee incurred neither personal expense nor personal liability in defending against that suit. Inasmuch as the employee has no standing to contest the Board's denial of an award of attor ney's fees, we will dismiss the employee's petition for review, and grant the Board's petition for enforcement.

## I. BACKGROUND

The Graphic Communications International Union Local No. 735-S (the "Union") is the exclusive bar gaining representative for all full-time and r egular part-time production and maintenance employees at the Quebecor Printing Inc. facility in Hazleton, Pennsylvania (the "Company"). Section 2.2 of the relevant collective bargaining agreement between the Union and the Company (the "CBA") contained what is commonly r eferred to as a "union security clause"[1] pr oviding as follows:

> It is agreed that new employees shall be r equired as a condition of continued employment to apply for membership in the Union upon completion of the [90-day] probationary period or on the ef fective date of the Agreement, whichever is later.

Section 2.4 of the CBA contained a dues checkof f authorizing the employer to withhold the amount of an employee's dues from his/her paycheck. Section 2.4 also stated that the dues checkoff authorization was irrevocable for a period of one year or until the expiration of the CBA, whichever was earlier, and that any timely r evocation would be effective 10 days after the Company r eceived written notice of it.

Patrick Quick had been president of the Union while working for another employer in the 1960's. He was hired by NADCO, the Company's predecessor, as a general helper

_____

1. The National Right to Work Legal Defense Foundation, Inc., the non-profit organization that provided the free legal services to the employee here, does not agree that S 2.2 is a"union-security clause." Rather, it describes that provision as a "forced-unionism provision." See Foundation's Br. as Intervenor in No. 00-3032, at 4.

The Foundation describes itself as a "charitable organization that provides free legal aid to individual employees suffering from abuses of compulsory unionism arrangements." Foundation's Br. in No. 99-4043, at 11. We do not attempt to resolve this rhetorical (and ideological) dispute. We will, however, refer to the provision as a "union security clause" because that is generally how courts describe provisions in collective bargaining units that purport to r equire union affiliation as a condition of employment. See Marquez v. Screen Actors Guild, 525 U.S. 33 (1998).

4

in August of 1993. A collective bargaining agr eement between NADCO and the Union contained a union security clause identical to S 2.2 above. Quick joined the union and signed a checkoff authorization form when he was hired by NADCO. In 1995, the Company purchased NADCO and the CBA was ratified including SS 2.2 and 2.4.

On August 23, 1996, Quick prepared and signed two letters. The first referred to a speech given at the Harvard School of Business concerning the importance of human assets in a business. It also contained his own thoughts about how a union should treat its members. Quick concluded that letter with: "Therefor e due to the fact that the above does not seem to be the purpose of this Union, I therefore submit the following r esignation." The second letter began: "I, Patrick D. Quick, do her eby resign" from the Union. It then listed his reasons and ended with: "I HEREBY RESIGN." Quick gave the documents to a Company employee named Charlie Allen. Allen was not an agent of the Union, but he accepted the letters and said that he would give them to the chief shop stewar d. Quick also gave copies of the letters to Jack Butler , the Company's Director of Human Resources. The company continued to deduct the full amount of union dues fr om Quick's paycheck after he delivered these letters.

In March, 1997, Quick sent a letter to Thomas Obzut, the Union's treasurer-secretary. That letter stated:

> As a non-member of [the Union] working in the [Company's] bargaining unit, I am being forced to have deducted from my pay an amount equivalent to the full member dues. To the extent that I may be r equired to pay anything to [the Union] I do not want to pay more than is legally required. Specifically, I do not want to pay if at all the "financial core" minimum2 required to

_____

2. As we will discuss later, under S 8(a)(3) of the NLRA, 29 U.S.C. S 158(a)(3), a union security clause can not r equire full union membership as a condition of employment. Patter n Makers' League of North America, AFL-CIO v. NLRB, 473 U.S. 95, 106 (1985). Rather, "[u]nder S 8(a)(3), the only aspect of union membership that can be required pursuant to a union shop agr eement is the payment of dues." Id. at 106 n.16. Consequently, "[m]embership as a condition of

5

support the Union's administration [of the CBA]. Please advise me in writing 1) what the "financial cor e" minimum amount is which the Union contents (sic) I am required to pay, and 2) the basis for the Union's calculation in that regard.

The Union received that letter on March 11, 1997. On March 24, Obzut responded with a letter in which he informed Quick that the "financial cor e" amount was 83.53% of full union dues. That letter further stated that Quick would receive a rebate of 16.47% every January as long as he remained a member of the Union. However, the full amount of union dues continued to be deducted from Quick's pay.

On April 13, Quick sent the Union a letter r equesting financial justification for the Union's calculations of the percentage of dues owed by "financial cor e" members and objecting to paying full dues subject to an annual r ebate. On May 19, 1997, Obzut sent Quick a letter that began: "This is to advise you that I have received your letter stating your wish to become a non-member of the Union. Y ou further explained your wish to become a financial core member of the Union." The letter then argued the advantages of full union membership, and concluded,"if I do not hear from you again, I will assume that your resignation is effective as of May 1, . .. . You must notify me in writing if you wish to become a Beck objector as well . . . ."3 At this point, the Union regarded Quick as a

_____

employment is whittled down to its financial cor e." NLRB v. General Motors Corp., 373 U.S. 734, 742 (1963)(inter nal citations omitted). An employee who does not want to be a full union member is called a "financial core" member. See Id. A financial core member is a " `member' of the union only in the most limited sense," and"is not subject to union discipline." Id. at 106 n.16. For example, we have held that a union cannot impose disciplinary fines on bargaining unit members who crossed a picket line and returned to work after notifying the union of their desire to change their status from full union members to financial core members. NLRB v. Local 54, Hotel Employees & Restaurant Employees International Union, ALF-CIO, 887 F.2d 28 (3d Cir. 1989).

3. In Communications Workers of America v. Beck, 487 U.S. 735, 744 (1988), the Court held that S 8(a)(3) of the NLRA does not require

6

financial core member effective May 1, 1997, and began deducting financial core dues from Quick's paycheck as of that date.

On June 2, Quick sent another letter to the Union in which he asserted that he had previously r esigned from membership in the Union, that the requir ement that he continue to pay any dues violated the NLRA, and that the requirement was not justified under the CBA. That letter ended: "Effective (10) days from now I revoke my dues checkoff form I previously may have signed several years earlier." The Union received this letter on June 6 and the all dues deductions from Quick's paycheck ceased about ten days later.

On June 10, Obzut acknowledged receipt of Quick's June 2nd letter, but said that Quick, as past pr esident of the Union, knew that Pennsylvania was not a "right-to-work" state and that if he wished to continue to work for the Company, he would have to pay union dues pursuant to the CBA. However, Obzut followed up with yet another letter dated July 23, in which Obzut acknowledged Quick's right to discontinue Quick's dues checkoff. However, that letter continued:

> Let me inform you that as long as you ar e a member of [the Union] you are obligated to pay Union dues. . . .

_____

financial core members "to support union activities beyond those germane to collective bargaining, contract administration and grievance adjustment." The Court concluded that S 8(a)(3) only authorizes a union to exact those dues "necessary to perfor ming the duties of an exclusive representative of the employees in dealing with the employer on labor-management issues." Id. at 762-63 (citation and internal quotations omitted). Consequently, financial core members "may request that their dues and fees be reduced by the percentage of funds allocated by the union to nonrepresentational activities," Thomas v. NLRB, 213 F.3d 651, 654 (D.C. Cir. 2000), including such activities as lobbying and political campaigning. Id. Employees who request such a reduction in union fees are known as "Beck objectors." Id.  Beck objectors have a right to challenge the union's calculation of the reduced dues, Penrod v. NLRB, 203 F.3d 41, 44 (D.C. Cir. 2000), by r equiring the union to justify the percentage deducted. Id. Despite Obzut's letter to the contrary, there does not appear to be any difference between a Beck objector and financial core membership.

7

> I suggest that you contact me within ten days after receiving this notice as that (sic) we can discuss how you are going to pay your dues. Let me also advise you that you are now in arrears for thr ee weeks in June and three weeks in July.[4]

Quick responded with another letter of his own in which he said:

> Your letter of July 23, totally misses the point of my letter to you of June, 1997. I am not requir ed to pay money to a union in order to work at [the Company] not by checkoff, not otherwise. This is my right under federal law. Similarly, you also incorrectly state "that as long as you are a member of [the Union] you are obligated to pay Union dues." But I am not a member of [the Union]: as you well know, I have long since resigned my membership in [the Union]. Therefore, your statement that I am "in arrears" is also wrong.

On August 11, Obzut sent Quick a letter that r ead:

> I have just received your letter stating that Federal Law forgives you, your requirement to pay Union Dues. I strongly suggest that you check the law again. Federal Law mandates that as long as you work in a Union shop you must pay Dues.
>
> If I do not hear from you concerning your Dues (you are now in arrears) I will take Legal action against you for the collection of your Union Dues.
>
> I am giving you ten days from the date of this notice to contact me so that we can rectify this matter .

---

4. There is some ambiguity as to whether the company ceased all deductions in June, or merely began deducting "core" dues. However, it appears that all deductions of dues ceased in mid June and thereafter the Union pursued the 85% portion that it maintained represented Quick's financial core obligation under the CBA. See the Union's Br. in opposition to the Petition for Enforcement at 9, and Quick's Br. as Intervenor at 10.

We need not resolve this ambiguity with precision however, as we hold that the Union was not entitled even to "cor e payments" under this CBA after Quick resigned.

8

On September 8, Obzut sent Quick one final letter . In it, he told Quick that Quick was then in arrears for 13 weeks of financial core dues ($63.18), and Obzut r eiterated that he would take legal action to collect that amount on behalf of the Union. Shortly thereafter, the Union filed a lawsuit in state court seeking payment of the alleged arr earages. The Union claimed that Quick then owed dues from the second week of June through the first week of September. The Company's attorney assisted Quick in successfully removing the state suit to federal district court. Thereafter, Quick filed a charge with the NLRB and the NLRB subsequently issued a complaint charging that the Union had violated S 8(b)(1)(A) of the NLRA, 29 U.S.C. S 158(b)(1)(A),5 by threatening Quick with legal action to coer ce payment of dues as a condition of employment, and by filing a lawsuit to collect the dues that Quick purportedly owed. 6 The

_____

5. Section 8(b)(1)(A) of the NLRA provides:

>       (b) Unfair labor practices by labor organization

>       It shall be an unfair labor practice for a labor or ganization or its
>       agents--

>       (1) to restrain or coerce (A) employees in the exercise of the rights
>       guaranteed in section 157 of this title: Provided, That this paragraph
>       shall not impair the right of a labor organization to prescribe its own
>       rules with respect to the acquisition or r etention of membership
>       therein;. . . .

29 U.S.C. S 158(b)(1)(A). Section 157 gives the employees the following rights:

>       Employees shall have the right to self-organization, to form, join, or
>       assist labor organizations, to bargain collectively through
>       representatives of their own choosing, and to engage in other
>       concerted activities for the purpose of collective bargaining or other
>       mutual aid or protection, and shall also have the right to refrain
>       from any or all of such activities except to the extent that such right
>       may be affected by an agreement r equiring membership in a labor
>       organization as a condition of employment as authorized in section
>       158(a)(3) of this title.

29 U.S.C. S 157.

6. As noted earlier, the Company's attorney helped Quick remove the Union's state court action to federal district court. In the district court,

9

complaint also alleged that the Union unlawfully r etained dues deducted from Quick's wages. After a hearing, the administrative law judge agreed that the Union had violated the Act, and the judge recommended that the Union be ordered to cease and desist that unlawful conduct and take affirmative action to remedy it. The NLRB adopted the ALJ's conclusions, affirmed the ALJ's decision, and adopted his recommended order.

## II. THE NLRB'S DECISION AND ORDER

The NLRB agreed that Quick had effectively resigned from the Union in his March letter . It also agreed that S 2.2 of the CBA did not require employees to continue paying any union dues after resigning from membership in the Union. Accordingly, the NLRB ruled that the Union had committed an unfair labor practice under S 8(b)(1)(A) of the NLRA, by continuing to accept dues deducted fr om Quick's wages after his resignation up to mid June, and by threatening to sue and by actually suing to collect "delinquent" dues.

The NLRB ordered the Union to cease and desist the unlawful conduct, and from similarly restraining or coercing employees in the exercise of their statutory rights. It also ordered the Union to make Quick whole for all dues deducted from his wages beginning April 10, 1997 when his resignation became effective; to dismiss the lawsuit for the collection of union dues to the extent that it had not

_____

the Company's counsel filed motions to dismiss for lack of subject matter jurisdiction pursuant to Fed. R. Civ. P . 12(b)(1), and for failure to
state a claim upon which relief may be granted pursuant to Fed. R. Civ. P. 12(b)(6). However, counsel for the Company withdrew his entry of appearance shortly before Quick's reply to the Union's Opposition to the Motions was due. The Company's attorney was understandably concerned about the propriety of the Company defending Quick against the Union. Immediately after the Company's attor ney withdrew his appearance, the Foundation entered its appearance for Quick. The Foundation represents, without contradiction from the Union, that the district court dismissed the Union's action to collect dues for lack of subject matter jurisdiction. Foundation's Br . on Behalf of Quick as Petitioner in No. 99-4043, at 10-11.

10

already been finally dismissed or withdrawn; to give employees appropriate notice of the Boar d's determination; and to reimburse Quick for any expenses incurr ed in defending the lawsuit. However, the NLRB r efused to order the Union to pay attorney's fees to Quick's counsel.

Quick filed a petition for review of the NLRB's order insofar as it denied his request for attor ney's fees (No. 99-4043) and the NLRB filed an application for enfor cement. (No. 00-3032). The Union intervened in Quick's petition for review and Quick intervened in the NLRB's petition for enforcement.

## III. STANDARD OF REVIEW

The NLRB's factual findings are conclusive if supported by substantial evidence on the record as a whole. See S 10(e) of the NLRA, 29 U.S.C. S 160(e). A reviewing court "may [not] displace the NLRB's choice between two fairly conflicting views, even though the court would justifiably have made a different choice had the matter been before it de novo." Universal Camera Corp. v. NLRB , 340 U.S. 474, 488 (1951). The NLRB's factual findings regar ding the intent of the parties to the collective bargaining agreement are entitled to the same deference as any other factual findings. IBEW Local 1395 v. NLRB, 797 F .2d 1027, 1030 (D.C. Cir. 1986). However, the NLRB's legal interpretation of a collective bargaining agreement is not entitled to judicial deference. Litton Financial Printing Division v. NLRB, 501 U.S. 190, 202 (1991).

Familiar principles of judicial deference to an administrative agency apply to the NLRB's interpr etation of the NLRA. See Holly Farms Corp. v. NLRB , 517 U.S. 392, 398-99 (1996). Therefore, the NLRB's construction of the NLRA will be upheld if it is "reasonably defensible." Ford Motor Co. v. NLRB, 441 U.S. 488, 497 (1979). 7

---

7. If "Congress had directly spoken to the precise question at issue," then "the [reviewing] court as well as the[administrative] agency, must give effect to the unambiguously expressed intent of Congress." Chevron USA, Inc. v. Natural Resources Defense Council, 467 U.S. 837, 942-43 (1984). However, "if the statute is silent or ambiguous with respect to a specific issue, . . . a court may not substitute its own construction of a statutory provision for a reasonable interpretation made by . . . an agency." Id. at 843-44.

IV. DISCUSSION

The petitions pending before us raise thr ee separate and largely interdependent issues. We must first decide whether substantial evidence supports the NLRB's finding that the Union committed an unfair labor practice by accepting and retaining dues deducted from Quick's wages and by threatening to sue, then suing, to collect dues arrearages after Quick resigned from the Union. Quick's challenge to the NLRB's refusal to grant him attorney's fees for defending against the Union's action requir es us to decide if he is "aggrieved" by the NLRB's order within the meaning of S 10(f) of the Act. In answering that question, we will discuss whether the NLRA authorizes the awar d of attorney's fees of the non-profit corporation that provided free legal services to Quick.

A. The NLRB's findings that the Union violated S 8(b)(1)(A).

Section 8(b)(1)(A) of the NLRA, makes it an unfair labor practice for a labor union to "restrain or coerce employees" in the exercise of rights guaranteed underS 7 of the Act, 29 U.S.C. S 157. Section 7 guarantees all employees the right to "self-organization, to form, join or assist labor organizations, to bargain collectively through representatives of their own choosing, and to engage in other concerted activities for the purpose of collective bargaining or other mutual aid or protection." However, S 7 also provides that employees "have the right to refrain from any or all of such activities except to the extent that such right may be affected by an agreement r equiring membership in a labor organization as a condition of employment as authorized" in S 8(a)(3) of the NLRA.

Earlier, we stated that the NLRB ruled thatS 2.2 of the CBA (the purported union security clause) "does not require that employees continue to pay dues to [the Union], as a condition of employment, after they have applied for membership but thereafter have resigned fr om membership." NLRB's Decision and Order , at 4. Consequently the NLRB held that the Union committed an unfair labor practice by continuing to accept dues that had

12

been deducted from Quick's pay after his resignation from the Union, and by attempting to collect dues that it claimed Quick owed despite his resignation.

Although the Union does not dispute Quick's right to resign,[8] it contends thatS 2.2 of the CBA required him to at least pay that percentage of dues that would constitute core financial payments.[9] Thus, argues the Union, because Quick was required to meet his financial core obligation, it did not commit an unfair labor practice under S 8(b)(1)(A) by continuing to collect his dues or attempting to collect arrearages.

Our resolution of this dispute turns on the scope of S 8(a)(3) of the NLRA, 29 U.S.C. S 158(a)(3). "Section 8(a)(3) makes it an unfair labor practice for an employer to "encourage or discourage membership" in a labor union "by discrimination in regard to hire or tenure of employment or any term or condition of employment." However, this prohibition has two specific exceptions that allow an employer and Union to enter into a collective bargaining agreement that conditions employment upon union affiliation. With certain exceptions not relevant to our discussion, the NLRA limits the prohibition against encouraging or discouraging union membership as follows: "nothing in this subchapter, . . . shall preclude an employer from making an agreement with a labor organization . . . to require as a condition of employment membership therein. . . .". 29 U.S.C. S 158(a)(3).

> Both the structure and purpose of S 8(a)(3) are best understood in light of the statute's historical origins. Prior to the enactment of the Taft-Hartley Act of 1947, S 8(a)(3) of the Wagner Act of 1935 (NLRA) permitted majority unions to negotiate "closed shop" agreements requiring employers to hire only persons who were already union members. By 1947, such agreements had come under increasing attack, and after extensive

_____

8. Section 8(a)(1)(A) prohibits union restrictions on a member's right to resign. Pattern Makers' League of North America, AFL-CIO v. NLRB, 473 U.S. 95, 104-114 (1985).

9. See n.2 supra and the discussion that follows in this section of the discussion.

hearings Congress determined that the closed shop and the abuses associated with it "create[d] too great a barrier to free employment to be longer tolerated." The 1947 Congress was equally concerned, however, that without such agreements, many employees would r eap the benefits that unions negotiated on their behalf without in any way contributing financial support to those efforts. As Senator Taft, one of the authors of the 1947 legislation, explained, "the argument . . . against abolishing the closed shop . . . is that if ther e is not a closed shop those not in the union will get a fr ee ride, that the union does the work, gets the wages raised, then the man who does not pay dues rides along fr eely without any expense to himself." Thus, the T aft-Hartley Act was "intended to accomplish twin purposes. On the one hand, the most serious abuses of compulsory unionism were eliminated by abolishing the closed shop. On the other hand, Congress r ecognized that in the absence of a union-security provision`many employees sharing the benefits of what unions ar e able to accomplish by collective bargaining will r efuse to pay their share of the cost.' "

Communications Workers of America v. Beck , 487 U.S. 735, 747-49 (1988)(footnote and citations omitted)(emphasis added). Thus, "Congress recognized the validity of unions' concern about `free riders,' i. e., employees who receive the benefits of union representation but ar e unwilling to contribute their share of financial support to such union. . . ." Radio Officers Union of Commer cial Telegraphers Union, AFL v. NLRB, 347 U.S. 17, 41 (1954). Congr ess enacted S 8(a)(3), in part, to "promote stability by eliminating `free riders." NLRB v. General Motors Corp., 373 U.S. 734, 741(1963). Consequently, "[a]s far as federal law was concerned, all employees could be requir ed to pay their way." Id.

The provisos of "S 8(a)(3) allow[ ] employers to enter into agreements requiring all the employees in a given bargaining unit to become members 30 days after being hired as long as such membership is available to all workers on a nondiscriminatory basis, but . . . pr ohibit[ ] the mandatory discharge of an employee who is expelled

from the union for any reason other than his or her failure to pay initiation fees or dues." Communications Workers of America v. Beck, 487 U.S. at 749.

In other words, S 8(a)(3) permits the establishment of what has come to be known as a "union shop." International Association of Machinists & Aer ospace Workers v. NLRB, 133 F.3d 1012, 1014 (7th Cir .), cert. denied sub nom., Strang v. NLRB, 525 U.S. 813 (1998). Section 8(a)(3) is the statutory authorization for "union security clauses," which establish and maintain a union shop. Mar quez v. Screen Actors Guild, Inc., 525 U.S. 33, 37 (1998)(citation omitted).

Although S 8(a)(3) allows the parties to a collective bargaining agreement to requir e union "membership" as a condition of employment, it does not define the nature of the "membership" that can be requir ed. However, in NLRB v. General Motors Corp., 373 U.S. at 742, the Court held that membership "insofar as it has significance to employment rights, may . . . be conditioned only upon payment of fees and dues." Consequently, " `[m]embership' as a condition of employment is whittled down to its financial core." Id. Thus, underS 8(a)(3), while the employees in a union shop are not requir ed to become full union "members", they are requir ed to pay union dues and initiation fees. Marquez v. Screen Actors Guild, 525 U.S. at 37 ("[A]n employee can satisfy the membership condition merely by paying to the union an amount equal to the union's initiation fees and dues.").10  Under S 8(a)(3) unions are allowed to collect and expend funds of nonmember objectors in union shops only to the extent that such funds are used for collective bargaining, contract administration, and grievance adjustment activities. Beck, 487 U.S. at 745. Employees in the bargaining unit who ar e not union members, and who object to the use of their dues for purposes other than negotiating and administering a collective bargaining agreement, ar e therefore entitled to a proportional reduction in the amount of dues charged. Id. at 762-763; see also Association of Machinists & Aerospace Workers, 133 F.3d at 1015.

_____

10. These employees are known as "financial core" members. See also n.3 supra.

Essentially then, "membership," as that ter m is used in
S 8(a)(3) is a "term of art; [and] the words and phrasing of
the section . . . encompass the rights . . . announced in
General Motors and Beck." Mar quez, 525 U.S. at 46. In
addition, because an employee can be dischar ged from
employment in a union shop for failing to meet theS 8(a)(3)
"membership" requirement, see , Radio Officers Union of
Commercial Telegraphers Union, AFL v. NLRB, 347 U.S. at
41,11 the union is to"notify workers that they may satisfy
their membership requirement by paying fees to support
the union's representational activities, and it must enforce
the clause in conformity with this notification." Marquez,
525 U.S. at 43. With this background in mind, we will
begin our inquiry into the issues raised by the Petition for
Review and the Petition for Enforcement her e.

In holding that Quick was not obligated to pay dues
pursuant to S 2.2 of the CBA after he r esigned from the
Union, the NLRB affirmed the ALJ's r easoning as follows:

> In ascertaining the obligations of employees under[a
> union security clause], the NLRB looks only to the
> express language of the agreed on contractual
> provision. Because the penalty for employees who fail
> to pay dues under a lawful union-security pr ovision
> may be discharge, this rule serves the valid purpose of
> assuring that employees may determine their
> obligation and avoid the penalty of discharge without
> fear that there are unwritten qualifications added to
> the express contractual provisions. . . .
>
> [T]he instant union-security clause . . . clearly
> requires only that employees "apply for membership" in
> the [Union] upon completion of the employees'
> probationary period. It does not requir e that employees
> maintain membership in, or pay dues to, [the Union] as
> a condition of employment. It fails to give notice to
> employees of any obligation that would restrict their
> right to resign from [the Union] and cease paying dues.

_____

11. Wherein the Court stated: "Thus an employer can discharge an
employee for nonmembership in a union if the employer has entered a
union security contract valid under the Act with such union, and if the
other requirements of the proviso ar e met."

16

> [We] conclude that the contractual language in this case does not require that employees continue to pay dues to [the Union], as a condition of employment, after they have applied for membership but ther eafter have resigned from membership.

NLRBs' Decision and Order, at 3-4. Although we do not owe the NLRB's interpretation of the CBA defer ence, Litton Financial Printing Division, 501 U.S. at 202, we conclude that the NLRB correctly affirmed the ALJ's interpretation of the union security clause here.

As the NLRB correctly noted, the unambiguous text of S 2.2 only requires new employees to apply for membership in the union upon completion of their probationary period. It requires only that, and nothing mor e. It does not contain any language that would even suggest that an employee must maintain his/her membership in the Union and pay dues to the Union as a condition of continued employment with the Company. Thus, this CBA is quite dif ferent from the one we interpreted in NLRB v. T elevision and Radio Broadcast Studio Employees Local 804, 315 F.2d 398, 401 (3d Cir. 1963). There, the collective bargaining agreement stated: "The [Employer] agrees to maintain a Union Shop, requiring that all employees (. . .) shall become members of the Union and all future employees must become members of the Union within thirty (30) days after employment, and that all employees will continue their membership in the Union during the term of this agreement . . .". (emphasis added).

Despite the obvious differences between the agreement here and the one exemplified by Studio Employees Local 804 (or perhaps because of them) the Union argues that the NLRB's interpretation of S 2.2 is too literal. The Union insists that the narrowness of the NLRB's interpretation both ignores and undermines much of the congressional purpose for enacting S 8(a)(3).

As noted earlier, Congress was concer ned that some employees would get a free ride on the back of the union's representational efforts if employees could refuse to pay their share of the cost of the union's r epresentational activities. Beck, 487 U.S. at 749. Thus, S 8(a)(3) was

17

enacted, in part, to promote labor stability by eliminating "free riders." General Motors, 373 U.S. at 742-3. The Union attempts to rewrite the CBA by parlaying this congressional concern into language that simply does not exist in S 2.2, and by emphasizing that the NLRB's interpretation of that clause has allowed Quick (and others in the bar gaining unit) to become a "free rider."

On the surface, the Board's interpr etation allowing "free riders" appears to undermine the car efully crafted statutory scheme of the Act as well as the policy considerations embodied in S 8(a)(3). However, Congr ess never intended S 8(a)(3) to function as a blanket prohibition of "free riders." Rather, S 8(a)(3) simply authorizes unions and employers to create a union shop and thereby agr ee that there will not be any "free riders" under a given collective bargaining agreement. See General Motors, 373 U.S. at 741 ("As far as federal law was concerned, all employees could be required to pay their way.")(emphasis added).

Quick is permitted to become a "free rider" because of the draftsmanship of S 2.2 not because the NLRB erroneously interpreted that clause or ignored the underpinnings of S 8(a)(3). After all, we must also remember that one of the NLRA's "fundamental policies is freedom of contract." H. K. Porter Co. v. NLRB, 397 U.S. 99, 108 (1970). The NLRB "oversee[s] and referee[s] the process of collective bargaining, leaving the results of the contest to the bargaining strengths of the parties." Id. The NLRB thus supervises the procedure of private bar gaining "without any official compulsion over the actual terms of the contract." Id. Inasmuch as S 8(a)(3) does not demand the elimination of "free riders," the NLRB, as the r eferee of the collective bargaining process, cannot read language eliminating "free riders" into a collective bargaining agr eement where the parties' own bargain omitted it.

Moreover, the Union's insistence that it was entitled to deduct Quick's core financial obligation following his resignation completely misses the point. An employee's core financial obligation can be deducted under a pr operly drafted union security clause because such a clause conditions employment upon union membership, i.e., union financial support. Since S 2.2 imposes no such obligation,

18

the Union could not create it by the unilateral act of deducting prorated representational and administrative costs from Quick's pay following his resignation from the Union.

The Union insists that this result ignor es the Supreme Court's decision in Marquez v. Scr een Actors Guild, Inc. We disagree. There, the Screen Actors Guild ("SAG") — a labor organization that represents per formers in the entertainment industry — had a collective bar gaining agreement with Lakeside Productions pursuant to which SAG was the exclusive bargaining agent for per formers hired by Lakeside. The agreement contained a union security clause providing that any perfor mer hired must be a "member of the Union in good standing." Id. at 38. The agreement also "[t]rack[ed] the language of S 8(a)(3)," id., in stating:

> The foregoing [section], requiring as a condition of employment membership in the Union, shall not apply until on or after the thirtieth day following the beginning of such employment or the effective date of this Agreement, whichever is the later; the Union and the Producers interpret this sentence to mean that membership in the Union cannot be requir ed of any performer by a Producer as a condition of employment until thirty (30) days after his first employment as a performer in the motion picture industry . . . . The Producer shall not be held to have violated this paragraph if it employs a performer who is not a member of the Union in good standing . . . if the Producer has reasonable grounds for believing that membership in the Union was denied to such performer or such performer's membership in the Union was terminated for reasons other than the failure of the performer to tender the periodic dues and the initiation fee uniformly requir ed as a condition of acquiring or retaining membership in the Union . . . .

Id. at 38-39 (emphasis added). Marquez, a part-time actress who had previously worked in the industry for more than 30 days, successfully auditioned for a one-line r ole in a television series produced by Lakeside. However , she was denied the part because she had not paid SAG's r equired

fees before beginning work. She sued SAG in federal court alleging that SAG had breached its duty of fair representation[12] by, inter alia, negotiating and enforcing a union security clause which required membership and the payment of full dues and fees even though that r equirement could not legally be enforced under General Motors and Beck. She also contended that the CBA should have contained additional language informing her of her rights under General Motors and Beck and telling her that she was not required to join SAG, but was only r equired to pay for SAG's representational activities.

The Court held that SAG had not breached its duty of fair representation. The Court agr eed that: "[i]f a union negotiates a union security clause, it must notify workers that they may satisfy the membership requir ement by paying fees to support the union's repr esentational activities, and it must enforce the clause in conformity with this notification." The Court nonetheless held that a union does not breach its duty of fair repr esentation "by negotiating a union security clause that uses the statutory language without expressly explaining, in the agreement, the refinements introduced by. . . General Motors and Beck." Id. at 43–44. The Court r easoned that:

> by tracking the statutory language [of S 8(a)(3)] [SAG] incorporate[d] all of the refinements that have become associated with that language. When we interpr eted S 8(a)(3) in General Motors and Beck, we held that the section, fairly read, included the rights that we found. To the extent that these interpretations are not obvious, the relevant provisions of S 8(a)(3) have become terms of art; the words and phrasing of the section now

---

12. "When a labor organization has been selected as the exclusive representative of the employees in the bar gaining unit, it has a duty, implied from its status under S 9(a) of the NLRA as the exclusive representative of the employees in the unit, to represent all members fairly." Marquez, at 44. When a plaintiff challenges an action that is arguably subject to S 7 or S 8 of the NLRA, that challenge is within the exclusive jurisdiction of the NLRB. Id. at 49. However, when a plaintiff "alleges a breach of the duty of fair r epresentation, [the] claim is cognizable in the first instance in federal court." Id.

20

encompass the rights that we announced in General Motors and Beck.

Id. at 46 (emphasis added). In other wor ds, the "statutory language [of S 8(a)(3)], which . . . incorporates all of the refinements associated with the language, is a shorthand description of workers' legal rights." Id. at 47(emphasis added). Accordingly, there was no need for SAG "to spell out all the intricacies of every term used in a contract." Id.

The Union insists that Marquez fills in the gaps in its collective bargaining agreement with the Company, and that Quick was therefore at least obligated to make financial core payments under Mar quez. Consequently, argues the Union, the NLRB's finding that Quick had no obligation to pay any dues after his resignation from the Union was error.

However, the clause at issue in Mar quez, allowed core financial fees to be deducted from Mar quez's salary because of its explicit terms requiring union membership. The Court had previously defined the nature of the membership that could be required to include only cor e financial support of the union. Accordingly, a collective bar gaining agreement requiring membership in the Union was all that was needed to mandate "core" financial support. Section 2.2 of the CBA neither tracks the language of S 8(a)(3) nor r equires employees to maintain union membership. As we have already explained, it only requires that workers apply for membership in the Union as a condition of employment. Therefore, we can not agree that the NLRB's interpretation of S 2.2 ignored the holding in Mar quez. Rather, the NLRB's reasoning is consistent with the analysis and holding in Marquez.

The Union concedes that the union security clause here is "somewhat ambiguous in that it does not specifically outline the obligations of bargaining unit members once they have joined the Union as required by the clause." Union's Br. as Respondent in Application for Enforcement (No. 00-3032), at 23. However, the Union, ar gues that "past practice" included requiring all bar gaining unit members to make, at a minimum, financial core payments to the Union. Id. at 23-24. Therefore, ar gues the Union, the NLRB should

21

have honored the parties' interpretation of the CBA as evidenced by their "past practice." Id. at 24. In other words, the Union contends that extrinsic evidence in the form of testimony regarding the alleged "past practice," would establish that all employees in the bargaining unit knew that they were at least required to make financial core payments to the Union, and that that obligation was part of S 2.2 of the CBA.

However, the Union does not even begin to discuss the standards for introducing extrinsic evidence to interpret a written contract.13 Moreover , it does not appear that there is any real evidence of "past practice" in this record. At most, there is evidence here of what one bargaining unit member, Quick, was told by a member of management, on one occasion. The Union cites to testimony that the Company's Human Resource Manager told Quick that he could become a financial core member. The Union then argues that Quick responded by saying that he intended to do so. See Union's Br. as Respondent in Application for Enforcement (No. 00-3032), at 25. This is not evidence of "past practice." As a general principle, past practice is admissible to interpret a contract: "Wher e an agreement involves repeated occasions for perfor mance by either party with knowledge of the nature of the per formance and opportunity for objection to it by the other , any course of performance accepted or acquiesced in without objection is given great weight in the interpretation of the agreement." Restatement (Second) of Contracts S 202(4). However, the rule allowing evidence of past practice "does not apply to an action on a single occasion." Id. cmt. g.

Moreover, extrinsic evidence of "past practice" could be admitted, if at all, only to resolve an ambiguity in the CBA. In U.A.W. Local 1697 v. Skinner Engine Company, 188 F.3d 130 (3rd Cir. 1999, we stated:

> Although extrinsic evidence is admissible to show that a written contract which looks clear is actually ambiguous, perhaps because the parties wer e using words in a special sense, . . . there must be either

_____

13. See generally Mellon Bank, N. A. v. Aetna Business Credit, Inc., 619 F.2d 1001, 1009-13 (3d Cir. 1980).

22

contractual language on which to hang the label of ambiguous or some yawning void . . . that cries out for an implied term. Extrinsic evidence should not be used to add terms to a contract that is plausibly complete without them.

Id. at 146 (internal quotation and citations omitted). Here, the NLRB correctly affirmed the ALJ's conclusion that there was nothing ambiguous about the clause in question. Section 2.2 contains no "void," nor does it cry out for us to contradict its text by implying a term.

We disagree with the Union's purported concession that the union security clause here is "somewhat ambiguous . . . ." Rather, we agree with the Board's conclusion that the clause unambiguously requires employees to"apply" for, but not maintain, union membership. To be sur e, the clause is probably poorly drafted and incomplete, but poor draftsmanship does not necessarily result in an ambiguity. Here, it simply results in a clause that can not reasonably be read as the Union suggests.

Admittedly, the NLRB's interpretation would r esult in an absurdity from the Union's standpoint because all employees could resign from Union membership and no longer be required to pay any dues at all after submitting the required application. Thus, the clause as interpreted does not guarantee the existence of the union shop that the Union apparently bargained for. However, the Union negotiated this clause with the Company, and that is the bargain it struck. Perhaps the Union agreed to this language because it assumed it could retain new members. It may also be as we surmise above, that the language is simply the result of poor drafting. However , it is not for us to say. It is not for this court to interpret the language in a manner that rewrites the CBA. Inasmuch asS 2.2 is plain on its face, we are bound by this interpr etation.

The Union also suggests that S 2.4 – the checkoff of union dues authorization – requires that an employee who resigns from union membership nonetheless continue to pay dues for the period of the irrevocability defined in the checkoff. However, that argument is without merit. A checkoff authorization is a partial assignment of futur e wages to the

23

union and is generally valid only if union membership is required as a condition of employment. IBEW Local 2088, 302 NLRB 322, 328-329 (1991). Once the employee r esigns from the union, the assignment is no longer valid, absent explicit language to the contrary. Id. This CBA contains no contrary language.

The Union also argues that the NLRB's interpr etation of S 2.2 would result in discrimination in violation of S 8(a)(3). See Union's Br. as Respondent in Application for Enforcement (No. 00-3032), at 31-33. The Union claims the checkoff authorization requires payment of union dues for one year after joining the Union. Thus, argues the Union, under the NLRB's interpretation, bargaining unit members who have not been with the Company for one year must pay dues, while bargaining unit members, like Quick, who have been with the Company in excess of one year can resign and not pay dues. In the Union's view, new employees are required to support the union, while more senior workers are not, and the Union ar gues that this amounts to illegal discrimination against new workers.14 We are not persuaded. Since the checkoff authorization is valid only if union membership is required by the union security clause, it is the union security clause that establishes a union shop, not a dues checkoff. Inasmuch asS 2.2 permits an employee to resign from the union after applying for membership, there can be no new worker vs. older worker discrimination because anyone can resign fr om membership after the probationary period is over.

For all of the above reasons, we find thatS 2.2 of the CBA does not require Company employees to continue paying any union dues as a condition of employment after they resign from membership in the Union. Since Quick was not required to make any payments to the Union following his resignation, the Union's attempts to collect"arrearages" was a violation of S 8(b)(1)(A), see Pr ofessional Assoc. of Golf

_____

14. According to the Union, this scenario"requires the employer to `discriminat[e] in regard to[a] term or condition of employment to encourage membership in [the Union]' in dir ect violation of Section 8(a)(3) of the Act." Union's Br. as Respondent in Application for Enforcement (No. 00-3032), at 33.

Officials, 317 NLRB 774, 778-79 (1995),[15] and the Board did not err in enjoining that lawsuit based upon the suit's unlawful objective. See Bill Johnson's Restaurants, Inc. v. NLRB, 461 U.S. 731, 737-38 n.5 (1983).

One matter remains before concluding our discussion of the Board's interpretation of S 2.2. The Union argues that there is no evidence to support a finding that Quick resigned prior to June 2, 1997. The Union insists that the NLRB's finding that the Union violated S 8(b)(1)(A) was therefore erroneous because the Union reduced Quick's dues to the financial core obligation r etroactive to May 1, 1997. This argument appears to proceed as follows: Obzut acknowledged that Quick no longer wanted to be a member of the Union and told Quick that he assumed Quick's resignation would be effective as of May 1, 1997 in his May 19, 1997, letter to Quick. Quick responded by sending Obzut a letter on June 2, 1997 telling Obzut that he had previously resigned from membership in the Union and protesting the continued deduction of dues fr om his pay. The Union insists that Quick's June 2, 1997 letter was the first time that Quick ever indicated to the Union that he wanted to resign.[16] Consequently, the Union accepted Quick's June 2, 1997 "resignation" r etroactively to May 1, 1997. However, the Union says that because it only sought to collect arrearages of full union dues prior to May 1, 1997, and financial core payments after that date, it could not have violated S 8(b)(1)(A) because it was entitled to collect both types of dues at the respective times. Union's Br. as Respondent in Application for Enfor cement (No. 00-3032), at 41-42.[17] However, the record supports the Board's

_____

15. The CBA in Prof. Assoc. of Golf Officials did not contain a union security clause, and the Board held that a lawsuit to collect dues in the absence of a union security clause was a violation of S 8(b)(1)(A). Here, of course, there is a purported union security clause. However, since that clause does not require union membership, the Union can not extract dues after resignation from the Union, and its attempts to do so violate S 8(b)(1)(A) under the reasoning of Prof. Assoc. of Golf Officials.
16. The letter that Quick prepared on August 23, 1996 were not delivered to agents of the Union, and the r ecord therefore does not establish any notice to the Union based on those letters.

17. The Union argues: "[b]ecause the Union sought only to recover arrearages of the full union dues prior to Mr . Quick's resignation, which

25

findings as to the date of Quick's resignation, and we do not believe that the Union's view of the facts is totally accurate. Our review of the record establishes that dues deductions from Quick's pay were not stopped until about 10 days after Quick's June 2 letter. The Company deducted dues from Quick's pay at least until June 16, 1997. Consequently, there were no arrearages prior to May 1, 1997. Moreover, the Union's state court complaint corroborates this. In that complaint the Union clearly alleges: "Mr. Quick refuses to pay union dues in the amount of $63.18 dating back to the second week of June until present." App. at 17 (emphasis added). The "present" was September 30, 1997, the date the complaint wasfiled. The Union was not entitled to any amount of dues after Quick resigned.

The Union's challenge to the Board's findings also ignores Quick's March, 1997 letter. That letter began: "[a]s a non-member of [the Union] working in the [Company's] bargaining unit, I am being forced to have deducted from my pay an amount equivalent to full member dues." Though that letter does not explicitly state: "I resign[ ]," it did not have to. "An employee may communicate his resignation from membership in any feasible way and no particular form is required so long as he clearly indicates that he no longer wishes to remain a member ." Distillery Workers Local 80, 235 NLRB 1264, 1265 (1978). Moreover, even assuming arguendo that the numer ous letters exchanged between Quick and Obzut could have led the Union to believe that Quick had not resigned as of March, 1997, a reviewing court "may [not] displace the NLRB's choice between two fairly conflicting views, even though the court would justifiably have made a differ ent choice had the matter been before it de novo," Universal Camera Corp. v. NLRB, 340 U.S. 474, 488 (1951). Thus, the Boar d's finding that Quick resigned in March of 1997 is supported by substantial evidence and, the Union's contention that the

_____

the Union retroactively accepted as of May 1, 1997 -- even though Mr. Quick had not, as of that date, expressed a clear intent to resign, and financial core payments after that resignation, the Union's actions were per se lawful under Beck."

effective date of resignation is June 2, 1997, must be rejected.

B. Involvement of the Company's Attorney.

The Union also contends that the Company violated S 8(a)(1) of the Act, 29 U.S.C. S 158(a)(1), by providing Quick with counsel in an effort "to invalidate a union security provision legally recognized by past practice between the parties in a collective bargaining relationship." Union's Br. as Respondent in Application for Enforcement (No. 00-3032), at 27. Section 8(a)(1) makes it an unfair labor practice for an employer "to interfer e with, restrain, or coerce employees in the exercise of their rights guaranteed" in S 7 of the Act. The Union appears to be ar guing that the Company wanted to invalidate the union security clause and therefore instigated Quick's r esignation and refusal to pay dues then supplied him with an attorney, Semler, to fight against the Union's efforts to collect.18 The Union further alleges that Semler obtained the law fir m of Rosenn, Jenkins and Greenwald, to represent Quick. Finally, the Union claims that Semler prepared the unfair labor practice charge that Quick filed with the NLRB. The Union believes that all of this "Company-provided legal advice has been directed at terminating Mr. Quick's obligation to the Union and invalidating the union security clause fr eely agreed upon between the Union and [the Company]." Id. at 30.

However, the Union's attack upon the Company and its involvement with Quick is beyond the scope of our r eview. Although the Union did file a charge alleging that the Company committed an unfair labor practice by pr oviding Quick with counsel, the General Counsel refused to issue a complaint on that charge. The General Counsel's exercise of discretion in refusing to issue a complaint is not subject to judicial review. NLRB v. Food & Commer cial Workers Local 23, 484 U.S. 112, 122-23 (1987). Accordingly, we could only consider an allegation of the Company's unlawful

_____

18. Steven R. Semler was the Company's lawyer and he helped Quick draft a response to the Union's notice that Quick was in arrears for past financial core obligations. Semler also filed the notice of removal when the Union sued Quick in state court.

27

conduct if that conduct arguably constituted a defense to the charge against the Union. See Chicago Tribune Co., 304 NLRB 259, 260 (1991). The NLRB found that the Company's conduct was not a defense to the Union's unlawful conduct. See NLRB's Decision and Or der at 4.

Moreover, the Board affir med the ALJ's conclusion "that there is no credible evidence to support[the Union's] assertion that [the Company], through Quick, attempted to invalidate the union-security provision. . . . The record clearly shows that Quick's desire to resign from membership preceded any assistance from the [Company] and was not caused by such assistance" That finding is supported by the record. Quick first indicated his intention to resign from the Union in August of 1996, and the NLRB found that his resignation was effective as of March, 1997. Quick received no legal assistance from the Company's attorney until July of 1997.

In its Decision and Order, the Boar d ordered the Union to reimburse Quick for any personal expenses he actually incurred in defending against the Union's lawsuit to collect his alleged arrearages after it concluded that the Union had engaged in unfair labor practices. Board's Decision and Order, at 1 n.2. However, Quick testified at the Board hearing that he did not incur any such expenses in defending against the Union's lawsuit. App. at 168-69. Moreover, both Semler and the Foundation agreed to represent him free of charge. 19 Nonetheless, Quick filed a petition for review in which he alleges that the NLRB erred by not awarding attorney's fees and costs to the Foundation for representing him in the Union's suit to collect $63.18 in arrearages.

Section 10(f) of the NLRA provides in r elevant part:

> Any person aggrieved by a final order of the NLRB
> granting or denying in whole or in part the r elief

_____

19. Semler waived any claim for his fees and costs. The Foundation admits that it has no fee arrangement with Quick and that it represented him for free. It also admits that Quick has not incurred any expenses in his defense of the Union's' lawsuit. Foundation's Br . on Behalf of Quick on Petition for Review (No. 99-4043), at 11 n.2.

> sought may obtain a review of such order in any
> United States court of appeals in the circuit wherein
> the unfair labor practice in question was alleged to
> have been engaged in or wherein such person r esides
> or transacts business.

Although S 10(f) does not define "aggrieved," courts have held that one must suffer "an adverse ef fect in fact," to be "aggrieved" under the NLRA. Retail Clerks Union 1059 v. NLRB, 348 F.2d 369, 370 (D.C. Cir . 1965). See also Sierra Club v. Morton, 405 U.S. 727, 733 (1972) (persons are "aggrieved" within the meaning of the Administrative Procedure Act, 5 U.S.C. S 702, only if the agency action causes them "injury in fact."). 29 U.S.C.S 160(f). Not surprisingly, because Quick admitted that he incurr ed no personal expenses in defending the Union's lawsuit and because the Board's order assures him full reimbursement for any such expenses in any event, the Boar d argues that Quick has no standing to seek review of thefinal order denying fees because he is not "aggrieved" within the meaning of S 10(f) of the NLRA. We agr ee.

Since Quick incurred no personal expenses in defending against the Union's lawsuit and since the Foundation volunteered to represent him at no charge, we are hard-pressed to understand how Quick can now maintain that he suffered an "adverse effect in fact" by the NLRB's refusal to order the Union to pay him for legal expenses he never incurred and for which he has no personal liability. The NLRB expressly ordered the Union to r eimburse Quick for any expenses he did incur in defending himself against the Union's lawsuit, and he is therefore assur ed full reimbursement for whatever personal obligations he may have incurred. Accordingly, the NLRB's or der precludes Quick from suffering any "injury in fact." Therefore, we conclude that Quick is not an "aggrieved" person under S 10(f) of the Act, and has no standing to seek review of the NLRB's order denying his request for attor ney's fees.

We realize that at least one court has concluded that although S 10(f) requires "an adverse effect in fact," it does not "require an injury cognizable at law or equity." Oil, Chemical & Atomic Workers Local Union No. 6-418, AFL-CIO v. NLRB, 694 F.2d 1289, 1294 (D.C. Cir . 1982) (citation

29

omitted). Under that view, "[a]s long as a charging party[20] gets less than he requested, he is treated as a person aggrieved under section 10(f)." Id. (citation omitted). However, we do not take this to mean that a charging party can request relief that is not authorized by the NLRA, and then seek compensation as an "aggrieved party" merely because he/she was denied some recovery the law did not allow in the first place. Common sense dictates that a party seeking relief under the NLRA must be denied something that is authorized by an applicable law befor e such person can be considered "aggrieved" under the Act, and Oil, Chemical & Atomic Workers is not to the contrary.

There, two unions attempted to discover the ingredients in certain products manufactured by Bor den Chemical Company and Colgate Palmolive that the unions maintained were harmful to the health and safety of employees. The companies refused to disclose that information, and the unions filed an unfair labor practice charge with the NLRB in two separate pr oceedings. The two administrative law judges hearing the charges agreed that both Colgate and Borden had engaged in unfair labor practices in refusing to divulge the requested information. As a result, both companies were or dered to furnish a complete list of raw materials and chemicals stor ed, handled, or processed at the plants in question. However, the orders specifically excepted any infor mation that was propriety or a trade secret. The ALJs or dered the unions and companies to enter into good faith bargaining to resolve the disclosure of any materials that the companies claimed were excluded from disclosure, and the unions appealed the decision the to NLRB.

The NLRB sustained the orders of disclosur e and agreed that the requested information related to the health and safety of employees and therefore r elated to the terms and

_____

20. A "charging party" is the person bringing an unfair labor practice charge before the Board. Oil, Chemical & Atomic Workers Local Union No. 6-418, AFL-CIO, 694 F.2d at 1295 n.10. The person or entity alleged to have committed the unfair labor practice is the"charged party." Id. Obviously, Quick is the charging party her e and the Union is the charged party.

conditions of employment. Id. at 1293. The Board therefore agreed that the union was entitled to all of the requested information, but declined to order the r elease of proprietary information or trade secrets because of the need to balance the union's need for such information against the "legitimate and substantial confidentiality interests of the employer." Id. (quoting Detr oit Edison Company v. NLRB, 440 U.S. 301 (1979). However, the Boar d declined to undertake that balancing test itself, and or dered the parties to resolve it through bargaining. Both companies and the unions filed petitions of review with the Court of Appeals for the D.C. Circuit. The companies moved to dismiss the unions' petitions arguing that the unions lacked standing under S 10(f). The companies insisted that the unions were not aggrieved because they had obtained virtually all the relief they sought.21 The companies reasoned that the Board's decision afforded the unions disclosure of nearly everything they sought. The court of appeals disagr eed, and held that the unions were aggrieved within the meaning of S 10(f) because the Board's order pr ecluded them from getting some information relating to the working conditions of union members even though the unions had won the right to get the vast majority of the information they sought. It was in that context that the court held that the charging party is "aggrieved [as long as it] gets less than [it] requested. . . " Id. at 1294. However, the law clearly entitled those unions to the relief they were seeking, and the issue of their standing under S 10(f) turned on whether the Board's order actually gave them all they were entitled to under the law.

Under the reasoning of Oil Chemical & Atomic Workers, Quick's status as an "aggrieved" party under the NLRB's order turns on whether the NLRB has the authority to award attorney's fees to a charging party who was forced to defend himself in an unlawful lawsuit filed by a union, but who incurred neither expense nor liability in defending against the suit. That is an entirely dif ferent question than the one posed by the inquiry into the unions' status in Oil Chemical & Atomic Workers. If the Boar d has the power to

_____

21. Both sides agreed that 99.5% of the companies' ingredients and materials were not protected under the Board's order.

31

award attorney's fees here, Quick is arguably "aggrieved"
under S 10(f); if it does not, he clearly is not "aggrieved" and
therefore lacks standing.22

It is readily apparent that S 10(c) is the only provision of
the NLRA which could possibly support Quick's r equest for
an award of attorney's fees here. It provides in relevant part
as follows:

> If upon the preponderance of the testimony taken the
> NLRB shall be of the opinion that any person named in
> the complaint has engaged in or is engaging in any
> such unfair labor practice, then the NLRB shall state
> its findings of fact and shall issue and cause to be
> served on such person an order requiring such person
> to cease and desist from such unfair labor practice,
> and to take such affirmative action including
> reinstatement of employees with or without back pay,
> as will effectuate the policies of [the Act].

29 U.S.C. S 160(c)(emphasis added). Section 10(c) "vest[s] in
the NLRB the primary responsibility and br oad discretion to
devise remedies that effectuate the policies of the Act,
subject only to limited judicial review." Sure-Tan, Inc. v.

_____

22. Quick's petition for review is not aimed at recovering attorney's fees
and costs for representation in the NLRB proceedings. In fact, Quick
could not request attorney's fees for r epresentation in the NLRB
proceedings because the General Counsel pr osecutes the case in NLRB
proceedings,

> the charging party's participation in the litigation is strictly
> voluntary. The union, employee, or employer filing a charge with
> the
> Board need not play any role in the pr oceedings beyond serving the
> respondent with a copy of the charge. Although the charging party
> may, if the General Counsel issues a complaint, participate in the
> hearing, nothing in the Act or in the Board's r egulations requires
> it
> to do so. If the General Counsel calls the char ging party as a
> witness, . . . then the General Counsel must pay the witness a fee
> for his time. In short, a charging party need not incur any
> litigation
> expense. Of course, the charging party may (and often does)
> intervene in the proceedings before the Board, but it does so as a
> volunteer, not a party haled into litigation willy-nilly.

Unbelievable, Inc. v. NLRB, 118 F.3d 795, 803 (D.C. Cir. 1997)(citations
omitted).

NLRB, 467 U.S. 883, 898-99 (1984). Judicial r eview of the NLRB's remedial orders is limited "[b]ecause the relation of remedy to policy is peculiarly a matter for administrative competence." Phelps Dodge Corp. v. NLRB, 313 U.S. 177, 194 (1941). Therefore, "courts must not enter the allowable area of the Board's discretion and must guard against the danger of sliding unconsciously from the narr ow confines of law into the more spacious domain of policy." Id.

In devising remedies to undue the effects of unfair labor practices, the NLRB "draws on a fund of knowledge and expertise all its own," NLRB v. Gissell Packing Co., 395 U.S. 575, 613 n.32 (1969), and on its "enlightenment gained by experience." Fibre Paper Products Corp. v. NLRB, 379 U.S. 203, 216 (1964)(citation omitted). Consequently, courts of appeals "should not substitute their judgment for that of the NLRB in determining how best to undue the effects of unfair labor practices." Sure-T an, Inc. v. NLRB, 467 U.S. at 899. The NLRB's choice of a remedy must be given "special respect by reviewing courts," NLRB v. Gissell Packing Co., 395 U.S. at 613 n.32, and must not be disturbed"unless it can be shown that the order is a patent attempt to achieve ends other than those which can fairly be said to effectuate the policies of the Act." Fibre Paper Products Corp. v. NLRB, 379 U.S. at 216 (citation omitted).

It is not clear to us whether Quick is claiming that the Board abused its discretion in denying his request for attorney's fees or whether he is arguing that the NLRA requires that the Board order an award of attorney's fees. However, we do not find any support for the latter position in the text of the Act, or in case law interpr eting it. To the extent that Quick is arguing that the NLRB abused its discretion by not awarding him attor ney's fees, we disagree. In fact, we believe that the NLRB's remedial or der here was eminently reasonable.

The NLRA "confers rights only on employees," Lechmere, Inc. v. NLRB, 502 U.S. 527, 532 (1992), and its purpose is the "protection of employees and the r edress of their grievances . . . after the employees have been made whole." Republic Steel Corp. v. NLRB, 311 U.S. 7, 11 (1940). Accordingly, it has long been recognized that the NLRB's "power to command affirmative action is r emedial, not

punitive." Id. at 12. However, the NLRB's remedial power under S 10 "is merely incidental to the primary purpose of Congress to stop and prevent unfair labor practices." Shepard v. NLRB, 459 U.S. 344, 352 (1983)(citation omitted). The Supreme Court reminds us"[t]he NLRB is not a court; it is not even a labor court; it is an administrative agency charged by Congress with the enfor cement and administration of the federal labor laws." Id. at 351. Requests for "complete relief " that might find a "receptive ear in a court of general jurisdiction" will often fall on deaf ears before the NLRB, because there ar e "wide differences between administrative agencies and courts." 23 Id. There is "nothing in the language or structure of the Act that requires the NLRB to reflexively or der that which a complaining party may regard as `complete relief ' for every unfair labor practice . . ." Id. at 352 (citation omitted).

Here, the Board found that the Union violated S 8(b)(1)(A). It then ordered the Union to "r eimburse [Quick] only for the personal expenses he actually incurred in defending against the lawsuit filed by the [Union]," pursuant to the discretion vested in it under S 10(c). Board's Decision and Order, at 1 n.2. The Board's order was the kind of r eimbursement order "typically used to `make whole' employees for violations of the Act." Teamsters Local 36, 249 NLRB 386 n.2, affirmed sub nom., Shepar d v. NLRB, 459 U.S. 344 (1983). Quick has clearly been made whole.

Moreover, the remedial order here is consistent with prior NLRB practice. In a recent case involving the Foundation's attempt to recover attorney's fees under circumstances analogous to the case at bar, the Boar d stated:

> We note that it is not the individual Char ging Parties who seek reimbursement for such expenses, since it is undisputed that they incurred none. Rather it is the Charging Parties' attorney, employed by the National Right to Work Legal Defense and Education Foundation, who seeks reimbursement for expenses and legal services which were provided under a "no fee" arrangement with the Charging Parties. The

_____

23. See e.g., Federal Communications Commission v. Pottsville Broadcasting Co., 309 U.S. 134, 141-44 (1940).

34

Foundation contends that "[j]ust as in the context of litigation under 42 U.S.C. S 1988, the identity of the attorney or the fact that the litigant did not personally incur legal expenses – because those expenses wer e paid by a charitable organization – cannot be determinative" of its entitlement to an award of attorney's fees.

We disagree. The National Labor Relations Act, which is essentially remedial, authorizes the NLRB to provide relief for actual losses of parties to our pr oceedings or those found to be victims of unfair labor practices. It is not aimed at compensating attorneys. By contrast, the attorney fee provision in 42 U.S.C. S 1988, specifically authorizes Federal courts to award attor ney's fees to prevailing parties in certain civil rights actions brought in Federal court. Although 42 U.S.C. S 1988 has been construed, consistent with congressional intent to encourage the availability of competent counsel for plaintiffs in private civil rights suits, to allow entities like the Foundation to recover attorney fees in such suits regardless whether the plaintif fs themselves incurred those fees (see Blanchard v. Bergeron, 489 U.S. 87 (1989)), it does not apply to proceedings under the NLRA. Accordingly, the judge did not err in failing to provide for such recovery.

United Food and Commercial Workers Locals 951, 7 and 1036 (Meijer, Inc.), 329 NLRB No. 69, 1999 WL 818607 at *14–15 (NLRB Sept. 30, 1999). The NLRB relied upon United Food and Commercial Workers in denying Quick's request for attorney's fees.

Nonetheless, Quick contends that by denying his r equest for attorney's fees for volunteered legal services the NLRB somehow ignored the Court's decision in Bill Johnson's Restaurants. There, the Court held that where the NLRB finds that an employer has an illegal objective infiling a lawsuit against employees, the NLRB, as a remedial measure, "may order the employer to reimburse the employees whom [the employer] had wrongfully sued for their attorney's fees and other expenses . . .[and] may also order any other proper relief that would effectuate the policies of the Act." Id. at 747 (emphasis added). Although

35

Bill Johnson's Restaurant involved an employer's suit against its employees, the underlying principles ar e equally applicable when a union files an unlawful lawsuit against an employee.

Nevertheless, Quick's reliance on Bill Johnson's Restaurant, is completely misplaced. In fact, the Court's brief mention of available remedies ther e fully supports the Board's decision to deny Quick's request for attorney's fees here. The Court used the permissive "may," not the mandatory "shall," and thereby indicated that the Board has the discretion to award attorney's fees in an appropriate case. Since no attorney's fees were incurred here, this is not an appropriate case. Mor eover, in Bill Johnson's Restaurant the Court said that the Board may "reimburse" such fees. "Reimburse" means "to pay back to someone." WEBSTER'S NINTH NEW COLLEGIATE DICTIONARY 993 (1990). Quick's argument requires us to ignore that wording or redefine "reimburse."24 We are neitherwilling, nor able to do that.

The NLRA, unlike federal statutes expressly authorizing an award of attorney's fees,25  does not contain a provision for the award of attorney's fees to pr evailing parties. In Alyeska Pipeline Service Co. v. Wilderness Society, 421 U.S. 240, 262 (1975), the Court ruled that "the cir cumstances under which attorney's fees are to be awarded and the range of discretion of the courts in making those awards are matters for Congress to determine." Section S 10(c) of the Act does not expressly provide for the payment of attorney's fees. We need not now decide whether any

_____

24. " `When I use a word,' Humpty Dumpty said, in a rather scornful tone, `it means just what I choose it to mean-- neither more nor less.'

`The question is,' said Alice, `whether you can make words mean so many different things.'

`The question is,' said Humpty Dumpty, `which is to be master -- that's all.' "

LEWIS CARROLL, ALICE'S ADVENTURES IN WONDERLAND (1865).

25. See, e. g., the Civil Rights Attorneys' Fees Awards Act of 1976,42 U.S.C. S 1988(b), and the Americans with Disabilities Act, 42 U.S.C. S 12205.

circumstances could ever exist that would justify an award of attorney's fees under S 10. However, absent "clear support" for an award of attorney's fees, either in the language or the legislative history of the statute, we cannot infer congressional intent to override the historic presumption against an award of attor ney's fees in the circumstances here. Summit Valley Industries, Inc. v. Carpenters, 456 U.S. 717, 726 (1982).

Quick relies on two cases in which the Foundation was awarded counsel fees for representing employees in actions against their unions even though the Foundation represented the employees free of charge. However, those cases involved public sector employees' lawsuits alleging constitutional violations against public sector unions and were, therefore, actions under 42 U.S.C. S 1983.26 The attorney's fee awards in those cases wer e therefore pursuant to fee-shifting provisions of S 1988, under which attorney's fees can be awarded even though the prevailing plaintiffs are represented fr ee of charge by nonprofit legal aid organizations. Blum v. Stenson, 465 U.S. 886 (1984). Accordingly, S 10(c) of the Act was not implicated in either case.

For all of the above reasons, we find that Quick does not have standing to request attorney's fees from the Board under the NLRA, and that the requested awar d of fees is beyond the statutory powers of the NLRB under the circumstances here.

V. CONCLUSION

For all of the foregoing reasons, we will deny the petition for review and grant the petition for enfor cement.

_____

26. See, Johnson v. Lafayette Fire Fighters' Association, 857 F. Supp. 1292 (N. D. Ind. 1994), aff 'd, 51F.3d 726 (7th Cir. 1995), and Tierney v. City of Toledo, 132 LRRM (BNA) 2829, 1989 WL 1615453 (N. D. Ohio, August 28, 1989).

A True Copy:
Teste:

       Clerk of the United States Court of Appeals
       for the Third Circuit

38