**PRECEDENTIAL**

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 12-1727
_____

AKERS NATIONAL ROLL COMPANY

v.

UNITED STEEL, PAPER AND FORESTRY,
RUBBER, MANUFACTURING, ENERGY,
ALLIED INDUSTRIAL AND SERVICE WORKERS
INTERNATIONAL UNION, AND ITS LOCAL UNION
1138-4 OFFICE AND TECHNICAL,

Appellant
_____

On Appeal from the United States District Court
for the Western District of Pennsylvania
(D.C. Civil No. 2-10-cv-01079)
District Judge: Hon. David S. Cercone
_____

Argued February 13, 2013

1

Before: HARDIMAN and ALDISERT, <u>Circuit Judges</u>, and
STARK,[*] <u>District Judge</u>.

(Filed:   April 4, 2013)

Daniel M. Kovalik
Mariana L. Padias (Argued)
United Steelworkers of America
Room 807
Five Gateway Center
Pittsburgh, PA 15222
        <u>Counsel for Appellant</u>

John B. Bechtol
Kenneth S. Kornacki (Argued)
Metz Lewis Brodman Must O'Keefe, LLC
535 Smithfield Street
Suite 800
Pittsburgh, PA 15222
        <u>Counsel for Appellee</u>

_____

OPINION OF THE COURT
_____

ALDISERT, <u>Circuit Judge</u>.

The Union representing certain employees at Akers
National Roll Company (the "Company") appeals from a

_____

[*] Honorable Leonard P. Stark, Judge of the United States
District Court for the District of Delaware, sitting by
designation.

judgment entered on March 13, 2012 by the United States District Court for the Western District of Pennsylvania. The District Court vacated an award issued by Arbitrator Richard D. Sambuco (the "Arbitrator"), granted the Company's motion for summary judgment, and denied the Union's motion for summary judgment.

In 2009, the Union submitted three grievances on behalf of Company employee and Union member Nelson Lubik, alleging that the Company violated a "past practice" by failing to schedule Lubik, a maintenance clerk, for Saturday overtime when the maintenance department was scheduled to work. After the Arbitrator sustained the three grievances and ordered the Company to pay Lubik back wages for the missed overtime, the Company sued to vacate the Arbitrator's award. The District Court vacated the award because it concluded that the award did not "draw its essence" from the Collective Bargaining Agreement (the "CBA" or "Agreement"); it reached this conclusion after determining that the plain language of the CBA "unambiguously" gave the Company the exclusive right to schedule its workforce. Because we disagree with the District Court's reasoning and its conclusion, we will reverse the District Court's judgment and will order enforcement of the Arbitrator's award.

I.

A.

The Company runs a manufacturing plant in Avonmore, Pennsylvania, and the Union is the exclusive collective-bargaining representative for clerical and technical

employees at the plant. From September 1, 2008 through February 29, 2012, the Company and the Union were parties to a CBA. The CBA included a multi-step grievance resolution procedure to be used when the Union and the Company disagreed over "interpretation or application of, or compliance with the provisions" of the CBA. App. 31. Under the CBA, unresolved grievances were submitted to arbitration.

In February and March of 2009, the Union submitted three grievances on behalf of Lubik, alleging that the Company violated the CBA by directing Lubik not to work Saturday shifts on February 14, February 28, and March 7, when employees of the maintenance department were scheduled to work. In the first grievance, the Union stated that the nature of the grievance was "Past Practice, the maintenance clerk has always worked when the Maintenance Department works whether full or partial crew." Id. at 65. Because Lubik would have been eligible for overtime pay if he had worked on a Saturday alongside maintenance department employees, the Union alleged that the Company should be liable to pay Lubik at the overtime rate for the hours he was not scheduled to work. Id.

Per the grievance resolution procedure, the Company submitted answers to the Union's allegations. Regarding the first grievance, the Company asserted that there was no violation of the CBA because the "Company has the right to schedule under Section 3 . . . of the Labor Agreement," because the CBA "does not recognize the existence of 'past practice' in an[y] form," and because "[t]he notion of a 'past practice' cannot undo or supersede clear contract language[;] Section 3 is very clear." Id. at 66. The Company additionally

4

asserted that "Section 2 – Scope of the Agreement [] states that any agreements must be put in writing and signed by the union designate and the company." Id.

The Company submitted answers to the second and third grievances as well, and its final answer stated that its position had not changed since its answer to the first grievance, "cit[ing] Section 2, Section 3 and all other relevant sections in support of its scheduling." Id. at 70. The final answer also referred to a "Section 9 D (C) page 20" in response to Lubik's grievance. The CBA does not contain a Section 9(D)(C), though, and page 20 contains portions of Section 8, "Rates of Pay," which does not appear to be relevant to the instant dispute.

The Company and the Union ultimately submitted the three grievances to arbitration per the CBA.

## B.

Because provisions of the CBA command our attention in deciding this case, we set forth the following relevant sections thereof.

Section 3 of the CBA, entitled "Management" and referred to as the "management rights clause," reads as follows:

> 1. The Company retains the exclusive rights to manage the business and plant and to direct the working forces. The Company, in the exercise of its rights, shall observe the provisions of this Agreement.

5

> 2. The rights to manage the business and plant and to direct the working forces includes the right to hire, suspend or discharge for proper cause, or transfer, and the right to relieve employees from duty because of lack of work or for other legitimate reasons.

Id. at 29.

Section 9 of the CBA is entitled "Hours of Work." Two provisions of that Section are relevant to our analysis, Sections 9(A)(1) and 9(B)(1), which read as follows:

> A. Normal Hours of Work
>     1. The normal workweek shall be 40 hours per week, scheduled on five successive days, from Monday through Friday, inclusive.
>
> B. Scheduling
>     1. If an employee is requested to report to work outside his regularly scheduled workweek and whether or not work is available he shall receive a minimum of 4 hours reporting pay at the employee's applicable rate of pay.

Id. at 38.

Section 2 is entitled "Scope of the Agreement." Within Section 2 is a paragraph referred to by the parties as a "zipper clause," which reads as follows:

Agreements for the plant will only be recognized if they are in writing and signed by the designate of the International, and the Negotiating Committee; provided, however, that any such agreements may be terminated by either party upon 30 days written notice to the other party.

Id. at 28.

## C.

On June 17, 2010, the Union and the Company participated in a hearing before the Arbitrator, and they "stipulated that the case being heard included three (3) grievances, all involving the same issue." Id. at 70. The Union and the Company presented their contentions and supporting evidence to the Arbitrator. The Arbitrator's award contains a section that summarizes the positions of the parties as presented at the arbitration hearing. Id. at 86-89. The thrust of the Union's argument was that a past practice had been established, and that a written, signed agreement was not required for its establishment. Id. at 87. The Union presented evidence in support of its argument, including the testimony of Lubik as well as exhibits detailing the maintenance department's work schedule from 2008-2010, along with payroll records for Lubik. Id. at 72-83. From this evidence, it was apparent that Lubik had worked weekend shifts along with the maintenance department employees even on weekends when he had not been formally scheduled to work, and that he had been paid overtime for that work. This practice concluded in 2009, leading to the Union's first grievance.

The Company argued that there was no past practice in its Agreement with the Union, because its zipper clause, located at Section 2 of the CBA, precluded a finding of past practice. It argued also that the CBA's Section 3 management rights clause included the right to schedule, that any modifying agreement would have to be in writing, and that the past practice agreement had never been reduced to writing.

In a decision that is now the subject of some dispute between the parties, the Arbitrator determined that he had to decide the following issue:

> Did the Parties to the Agreement as alleged in Grievance No. 2-2009 establish, by their actions in the year 2008, an unwritten past practice and did the Company violate this past practice? If the answer is yes, what is the remedy?

Id. at 84.

### D.

On July 17, 2010, the Arbitrator issued an award sustaining Lubik's grievances and awarding him $5,477.08 in back wages, as well as the amounts Lubik would have earned in profit sharing in 2009 and 2010 had he worked on weekends that the maintenance department was scheduled to work. The Arbitrator cited several provisions of the CBA, including Section 3's management rights clause. He did not cite to or refer to Section 9, the "Hours of Work" section. He focused his analysis and discussion on whether a past practice

8

had in fact been established, and whether Section 2's zipper clause prohibited a finding of past practice.

The Arbitrator concluded that the zipper clause failed to prohibit a finding of past practice, because it "does not acknowledge that the written contract constitutes the parties' entire agreement, is not explicit with regard to a waiver of the right to bargain about other conditions, nor is it a specific affirmation that management rights are not limited by prior practices." Id. at 91. The Arbitrator determined also that the language of the zipper clause was ambiguous, because its language appeared to indicate that an agreement that would satisfy the zipper clause would only require signature by the Union and not by the Company. Id. at 100. In addition, he described the characteristics of a binding past practice, including such factors as clarity, consistency, longevity, repetition, acceptability, underlying circumstances, and mutuality. Id. at 94-95.

The Arbitrator concluded that a binding past practice had been established when, in 2008, Lubik was permitted to work on weekends when his name did not appear in the work schedule. The Arbitrator noted that this practice occurred under two different maintenance managers, prior to and after adoption of the 2008-2012 CBA. Id. at 96. He noted also that the mutuality requirement was met because "the parties, by virtue of their constant response to a recurring set of circumstances, resulted in a mutually accepted way of doing things that culminated into a past practice that carried over into the present Collective Bargaining Agreement . . . ." Id. at 102. The Arbitrator concluded that the Union and the Company did establish a past practice that the Company violated when Lubik was not allowed to work along with the

9

maintenance department employees on weekends. Accordingly, the Arbitrator sustained Lubik's grievances and awarded him back wages and profit sharing.

E.

The Company then filed suit to vacate the Arbitrator's award, alleging that the award "ignores [the Company's] exclusive and express right to direct the workforce and to schedule overtime and therefore fails to draw its essence from the [CBA]." Id. at 23. In addition to citing Section 3's management rights clause, the Company cited to Section 9, "Hours of Work." Id. at 22. The Company alleged also that the Arbitrator exceeded his jurisdiction under the CBA by ignoring the CBA's clear provisions regarding the Company's right to direct the workforce and schedule overtime, and that the Arbitrator exceeded his authority by issuing an award that impermissibly modifies the CBA. Id. at 24.

The Company and the Union filed cross-motions for summary judgment. The District Court granted the Company's motion, denied the Union's motion, and vacated the award. The Union timely appealed.

II.

The District Court had jurisdiction under Section 301 of the Labor Management Relations Act, 29 U.S.C. § 185. We have jurisdiction under 28 U.S.C. § 1291. We exercise plenary review over the District Court's decision to vacate the arbitration award. Pa. Power Co. v. Local Union No. 272 of the Int'l Bhd. of Elec. Workers, AFL-CIO, 276 F.3d 174, 178 (3d Cir. 2001). "[W]e apply the same standard the district

court should have applied in reviewing the arbitration award." Exxon Shipping Co. v. Exxon Seamen's Union, 73 F.3d 1287, 1291 (3d Cir. 1996) (citation omitted). Our review is quite narrow. If an "arbitrator's award 'draws its essence from the collective bargaining agreement,' and is not merely 'his own brand of industrial justice,' the award is legitimate." United Paperworkers Int'l Union, AFL-CIO v. Misco, Inc., 484 U.S. 29, 36 (1987) (quoting United Steelworkers of Am. v. Enter. Wheel & Car Corp., 363 U.S. 593, 596 (1960)). As this Court stated 44 years ago:

> [A] labor arbitrator's award does draw its essence from the collective bargaining agreement if the interpretation can in any rational way be derived from the agreement, viewed in the light of its language, its context, and any other indicia of the parties' intention.

Ludwig Honold Mfg. Co. v. Fletcher, 405 F.2d 1123, 1128 (3d Cir. 1969) (internal quotation marks omitted).

Indeed, a reviewing court may disturb an arbitrator's award "only where there is a manifest disregard of the agreement, totally unsupported by principles of contract construction and the law of the shop." Id.; see also Brentwood Med. Assocs. v. United Mine Workers of Am., 396 F.3d 237, 241 (3d Cir. 2005); Major League Umpires Ass'n v. Am. League of Prof'l Baseball Clubs, 357 F.3d 272, 280 (3d Cir. 2004); Exxon Shipping Co. v. Exxon Seamen's Union, 993 F.2d 357, 360 (3d Cir. 1993); Virgin Islands Nursing Ass'n's Bargaining Unit v. Schneider, 668 F.2d 221, 223 (3d Cir. 1981). The Supreme Court has phrased the same idea in this fashion: "if an arbitrator is even arguably construing or

applying the contract and acting within the scope of his authority, the fact that a court is convinced he committed serious error does not suffice to overturn his decision." Major League Baseball Players Ass'n v. Garvey, 532 U.S. 504, 509 (2001) (per curiam) (internal quotation marks and citation omitted). The Garvey Court stated that arbitration awards may be unenforceable "only when the arbitrator strays from interpretation and application of the agreement and effectively 'dispense[s] his own brand of industrial justice.'" Id. (quoting Enter. Wheel, 363 U.S. at 597).

III.

The overarching question presented to us here is whether the Arbitrator's award draws its essence from the CBA. The Union insists that it does; the Company argues, in total agreement with the District Court, that it does not.

The District Court concluded that the Arbitrator's award did not draw its essence from the CBA, after determining that the plain language of CBA Sections 3 and 9 gave the Company the exclusive right to direct and schedule its workforce. In addition, the Court concluded that because the Arbitrator's award did not draw its essence from the CBA, the Arbitrator exceeded his authority when he relied on the alleged past practice of the Company.

We regret we must disagree with both of the District Court's conclusions. When parties knowingly and voluntarily bargain for arbitration to resolve disputes, they receive the benefits of fast results and reduced dispute-resolution expenses. See Major League Umpires Ass'n, 357 F.3d at 289. These benefits, however, do not come without risk, and "the

12

possibility of receiving inconsistent or incorrect rulings without meaningful appellate review of the merits is one of the risks such parties must accept when they choose arbitration over litigation." Id. In short, "[i]t is the arbitrator's construction which was bargained for; and so far as the arbitrator's decision concerns construction of the contract, the courts have no business overruling him because their interpretation is different from his." Enter. Wheel, 363 U.S. at 599.

The District Court here erred in the same manner as the trial judge did in News America Publications, Inc. v. Newark Typographical Union, Local 103, 918 F.2d 21 (3d Cir. 1990). Speaking for the Court was Chief Judge Higginbotham:

> As Judge Aldisert has observed, federal labor law elevates labor arbitrators to "an exalted status." Ludwig Honold Mfg. Co. v. Fletcher, 405 F.2d 1123, 1126 (3d Cir. 1969). . . . A court may not overrule an arbitrator simply because it disagrees with the arbitrator's construction of the contract, . . . or because it believes its interpretation of the contract is better than that of the arbitrator. See W.R. Grace & Co. v. Local 759, International Union of the United Rubber Workers, 461 U.S. 757, 764, 103 S.Ct. 2177, 2182, 76 L.Ed.2d 298 (1983).

News Am. Publ'ns, 918 F.2d at 24.

13

Here, the Company accepted the risk of arbitration, and now seeks to avoid its result; we will not permit it to do so.

IV.

The Company contends that Sections 3 and 9 of the CBA unambiguously vested it with the exclusive right to schedule its employees. Citing Pennsylvania Power, it argues that the Arbitrator manifestly disregarded the CBA and ignored the plain language of Sections 3 and 9, such that the award failed to draw its essence from the CBA. See Pa. Power Co., 276 F.3d at 178. The District Court agreed with the Company's contentions.

This raises a critical threshold issue for our consideration: was the CBA so unambiguous as to the Company's right to schedule its workforce such that the Arbitrator's award, in which he inquired into past practice, manifestly disregarded the CBA? This Court has stated that "extrinsic evidence of 'past practice' could be admitted, if at all, only to resolve an ambiguity in the CBA." Quick v. N.L.R.B., 245 F.3d 231, 247-248 (3d Cir. 2001). In support of this statement, Quick cited to U.A.W. Local 1697 v. Skinner Engine Co., 188 F.3d 130 (3d Cir. 1999), which, quoting an opinion of the U.S. Court of Appeals for the Seventh Circuit, stated:

> Although extrinsic evidence is admissible to show that a written contract which looks clear is actually ambiguous, perhaps because the parties were using words in a special sense, . . . there must be either contractual language on which to

14

> hang the label of ambiguous or some yawning void . . . that cries out for an implied term. Extrinsic evidence should not be used to add terms to a contract that is plausibly complete without them.

Id. at 146 (quoting Bidlack v. Wheelabrator Corp., 993 F.2d 603, 608 (7th Cir. 1993) (en banc)).

This Court has also stated that "[i]f the arbitrator's award has deviated from the plain meaning of a labor contract provision, it must find support in the contract itself *or in prior practices demonstrating relaxation of the literal language*." NF&M Corp. v. United Steelworkers of Am., 524 F.2d 756, 759 (3d Cir. 1975) (emphasis added) (citing H.K. Porter Co. v. United Saw, File & Steel Prods. Workers of Am., 333 F.2d 596 (3d Cir. 1964)).

It cannot be disputed that the Arbitrator focused his analysis on whether Section 2's zipper clause precluded a finding of a past practice. As the District Court correctly noted, the Arbitrator never explicitly stated that Sections 3 and 9 were ambiguous. In the view of the Company, the Arbitrator's failure to explicitly state that there was ambiguity in Sections 3 and 9, combined with the alleged clarity in the CBA that the Company had exclusive scheduling rights, precludes consideration of the effect of past practice. Although the District Court agreed with the Company, we do not.

The pertinent portion of Section 3 states that "[t]he Company retains the exclusive rights to manage the business and plant and to direct the working forces." App. 29. The

15

Arbitrator cited to this provision in a section of the award entitled "Contract Language," but as the Company points out, he did not explicitly address the import of Section 3 in his analysis. Indeed, he only mentions Section 3 as it pertains to Section 2's zipper clause, stating that the zipper clause's language is not "a specific affirmation that management rights are not limited by prior practices." Id. at 91. Throughout the course of the dispute, from the submission of the first grievance through the arbitration hearing, the Company cited Section 3's management rights clause for the proposition that it had the right to schedule its workforce. As an example, the Company's first response to the Union's grievance stated that "[t]he Company has the right to schedule under Section 3—MANAGEMENT page 4 of the Labor Agreement." Id. at 66-67. The "Position of the Company" presented at the arbitration hearing states that "[o]ur management's rights clause includes the right to schedule." Id. at 88.

From our reading of Section 3's management rights clause, however, the right to schedule does not appear anywhere in that clause. It appears, therefore, to be understandable that the Arbitrator refused to accept the notion that the contents of Section 3 unambiguously resolved the dispute presented to him. It might have been preferable for the Arbitrator to state explicitly that Section 3 was ambiguous, therefore permitting him to address the past practice issue. His failure to do so does not by itself, however, require that the award be vacated. We note that "[a]rbitrators have no obligation to the court to give their reasons for an award." Enter. Wheel, 363 U.S. at 598.

Before the District Court, and again before us, the Company relies heavily on the language of Section 9 of the CBA, entitled "Hours of Work." Nowhere in the "Position of the Company" contained in the Arbitration award does it appear that the Company cited to or relied upon the provisions of Section 9. The Company did refer to Section 9 in one of its responses to the Union's grievances, stating: "Section 9 D (C) page 20 does not mandate any monetary penalty for a failure to give a four hour notice. That section deals with a reporting allowance for a shift when the employee was not notified and actually reports for work." App. 70. The parties appear to agree that this reference by the Company was actually to Section 9B(1), which states that "[i]f an employee is requested to report to work outside his regularly scheduled workweek and whether or not work is available he shall receive a minimum of 4 hours reporting pay at the employee's applicable rate of pay." Id. at 38.

According to the Company, the critical language of Section 9B(1) is "[i]f an employee is requested to work outside his regularly scheduled workweek." Brief of Appellee 15. Section 9A(1) defines a "normal workweek" as "40 hours per week, scheduled on five successive days, from Monday through Friday, inclusive." App. 38. From this the Company contends that this language unambiguously bestows upon it an exclusive right to schedule. Again, we disagree.

First, we note that the Company misquotes the CBA, which actually states "[i]f an employee is requested *to report* to work outside his regularly scheduled workweek . . . ." Id. (emphasis added). More importantly, this interpretation of Section 9 was never put before the Arbitrator. Even if it had been, the language is not so unambiguous as to compel a

17

finding that the Company had the exclusive right to schedule employees for weekend work. Language discussing compensation for employees who are asked to report—and upon reporting find that their services are not needed that day—simply is not the equivalent of a clear statement that the Company has an exclusive right to schedule.

Even accepting the Company's argument that the CBA's plain meaning gives it the exclusive right to schedule, the Arbitrator would have been justified in deviating from that plain meaning because prior to the CBA's existence, Lubik was allowed to work whenever the maintenance department worked. This constitutes a "prior practice[] demonstrating relaxation of the literal language." See NF&M Corp., 524 F.2d at 759.[1] As we discuss below, the Arbitrator determined that the CBA's zipper clause did not bar establishment of a prior practice, notwithstanding the Company's protestations.

We conclude, therefore, that the CBA was not so free of ambiguity regarding the Company's exclusive right to

---

[1] We note that this is in tension with this Court's pronouncement in Quick that "extrinsic evidence of 'past practice' could be admitted, if at all, only to resolve an ambiguity in the CBA." Quick, 245 F.3d at 247-248. The Union contends that Quick and Skinner Engine are distinguishable because they were not cases where this Court was asked to review an arbitration award. Although we need not decide it here, given that we disagree with the District Court's conclusion that the CBA unambiguously gives the Company exclusive scheduling rights, the Union persuasively distinguishes those cases.

18

schedule its workforce such that the Arbitrator's inquiry into past practice and introduction of extrinsic evidence were not permissible. Our inquiry, however, does not end there. We still must determine whether the award draws its essence from the CBA.

V.

The Union maintains that a past practice both could be and was established, notwithstanding the zipper clause in Section 2 of the CBA. As discussed previously, the Company contended throughout the dispute that the clarity of Section 3 precluded use of past practice to "undo or supersede clear contract language." App. 67. The Company contended also that Section 2's zipper clause required any agreements to be put in writing and signed by the Union designate and the Company. Id. We will defer to the Arbitrator's ultimate conclusion that a past practice both could be and had been established.

The Company and the District Court faulted the Arbitrator for formulating the issue presented to him as follows: "Did the Parties to the Agreement as alleged in Grievance No. 2-2009 establish, by their actions in the year 2008, an unwritten past practice and did the Company violate this past practice? If the answer is yes, what is the remedy?" Id. at 84. We agree with the Company that the Union exaggerates its position when it states that, "*as directed by the Company*, the Arbitrator focused on CBA Section 2, the purported 'zipper clause.'" Brief of Appellant 22 (emphasis added). Although the Company did indeed stipulate that the case included three grievances all involving the same issue, we believe that the Company was merely acknowledging that

19

all three grievances contained the same allegations regarding the Company's failure to schedule Lubik for weekend work. This acknowledgment is not the same as stipulating that the Arbitrator was only to consider whether a past practice could be established under the CBA, and more specifically under Section 2.

Nevertheless, "the deference that is accorded to an arbitrator's interpretation of the collective bargaining agreement should also be accorded to an arbitrator's interpretation of the issue submitted." Major League Umpires Ass'n, 357 F.3d at 272 (internal quotation marks and citations omitted). The Arbitrator considered the contentions of the parties, the evidence presented, and the history of the dispute between the Union and the Company. He then determined that he was required to decide whether the parties established a past practice by their actions in 2008, and whether that past practice was violated. From the presentation of the parties' respective positions at the arbitration hearing, it appears that both the Union and the Company focused on whether a past practice could exist under the CBA, and specifically on whether Section 2's zipper clause precluded introduction of past practice into the CBA. Tellingly, the Company submitted only one non-joint exhibit during the arbitration hearing, a handwritten document entitled "Saturdays N. Lubik Did Not Work." App. 83. Accordingly, we defer to the Arbitrator's determination that the issue presented was whether a past practice had been established and violated.

In the award's "Discussion on the Merits," the Arbitrator discussed, at some length, the process by which a past practice can become established, and he found that a binding past practice had in fact been established. He

addressed the Company's contention that its Section 2 zipper clause precluded establishment of a past practice without a written agreement. The Arbitrator considered the Company's interpretation of the zipper clause, and stated:

> This language does not acknowledge that the written contract constitutes the parties' entire agreement, is not explicit with regard to a waiver of the right to bargain about other conditions, nor is it a specific affirmation that management rights are not limited by prior practices.

Id. at 91.

Throughout the Arbitrator's discussion, he emphasized that the past practice *began before the adoption of the CBA and continued thereafter*, and it appears that he believed this provided further support for the proposition that the Company's zipper clause was not dispositive. Accordingly, we defer also to the Arbitrator's conclusion that a binding past practice had been established.

The *sine qua non* of judicial review of an arbitration award is a heavy degree of deference to the arbitrator. And here the role of both a District Court and a Court of Appeals is far different than that of a District Court reviewing a decision of a Bankruptcy Court or a Court of Appeals reviewing a bench trial award. Arbitration is all about "private court adjudication," and the use of arbitration has been rapidly increasing over the years and shows no signs of slowing. Arbitration procedures themselves have a lengthy history, with law merchant origins in medieval Europe and

elsewhere. At bottom, arbitration is a kind of settlement technique in which a third party reviews the case and imposes a decision that is legally binding on both parties. It is designed to be faster and cheaper than resolving a matter in the trial courts, and it should not be subject to a lengthy and expensive judicial review.

A half century past, this Court made clear in Ludwig Honold that an award draws its essence from the CBA if it can be derived from the Agreement in any rational way, and that a reviewing court may disturb only those awards demonstrating a manifest disregard of the Agreement. 405 F.2d at 1128. In view of the previous discussion of ambiguities in the CBA's language, and applying the teachings of Ludwig Honold, we conclude here that the Arbitrator's interpretation draws its essence from the CBA, and that the Arbitrator did not manifestly disregard the CBA. Accordingly, the District Court should not have disturbed the award.

\* \* \* \* \*

The judgment of the District Court will be reversed and an Order issued to enforce the Arbitrator's award.