PRECEDENTIAL

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 19-2988
_____

INDEPENDENT LABORATORY EMPLOYEES' UNION,
INC.

v.

EXXONMOBIL RESEARCH AND ENGINEERING
COMPANY,
                                    Appellant

_____

On Appeal from the United States District Court
for the District of New Jersey
(D.C. No. 3:18-cv-10835)
District Judge: Honorable Brian R. Martinotti

_____

Argued May 19, 2020

Before:  McKEE, BIBAS, and COWEN, *Circuit Judges*

(Opinion filed: August 26, 2021)
_____

John K. Bennett, Esq. [ARGUED]
Jackson Lewis
200 Connell Drive
Suite 2000
Berkeley Heights, NJ 07922

Daniel D. Schudroff
Jackson Lewis

666 Third Avenue
29th Floor
New York, NY 10017
        *Counsel for Appellant*

Dominick Bratti, Esq. [ARGUED]
Annemarie T. Greenan, Esq.
Bratti Greenan
1040 Broad Street
Suite 104
Shrewsbury, NJ 07702
        *Counsel for Appellee*

_____

OPINION
_____

McKEE, *Circuit Judge.*

ExxonMobil Research and Engineering Company ("EMRE" or "the Company") appeals the District Court's order affirming an arbitration award preventing EMRE from permanently contracting out bargaining unit positions at its Clinton, New Jersey facility. EMRE argues the award should be vacated because the Arbitrator overstepped her role by improperly considering extrinsic evidence contrary to the governing collective bargaining agreement ("CBA"). As we detail below, the standard of review for upholding arbitration awards is highly deferential. The District Court concluded that the award "withstands the minimal level of scrutiny appropriate for review of an arbitration award."[1] We agree. As the Supreme Court has explained, "courts have no business overruling [an award] because [our] interpretation of the contract [may differ]."[2] Accordingly, we will affirm the District Court's decision.

I.

_____

[1] *Indep. Lab. Emps.' Union, Inc. v. ExxonMobil Research and Eng'g Co.*, No. 3:18-cv-10835-BRM-DEA, 2019 WL 3416897, at *9 (D.N.J. July 29, 2019).
[2] *United Steelworkers of Am. v. Enter. Wheel and Car Corp.,* 363 U.S. 593, 599 (1960).

## A. Factual Background

Independent Laboratory Employees' Union, Inc. ("ILEU" or "the Union") represents about 165 employees at the Clinton research facility. EMRE research supports several hundred of ExxonMobil's laboratories and plants. The positions at EMRE fall into "core" or "non-core" positions. As described by the Company, "core" positions are those that are directly associated with EMRE's research and business functions.[3] Support roles such as security and materials delivery jobs are defined as "non-core" positions. Currently, the Union represents about twenty-five percent of all EMRE staff. Although the bargaining unit has remained roughly the same size over the years, proportionally, the percentage of core positions has increased, and the percentage of non-core positions has decreased. Today, at least eighty percent of Union members are in "core" positions.

EMRE and the ILEU have a long history of negotiation, arbitration, and litigation concerning EMRE's hiring of independent contractors to do work typically done by bargaining unit members. This history includes prior grievances and arbitrations pertaining to the duration of independent contracts initiated in 1977, 1983 (the *Stark Award*), and 1984 (the *Florey Award*). The current dispute arose in 2015, when a bargaining unit member in the position of materials coordinator retired.[4] After advertising internally failed to fill the open position, EMRE contracted independent contractors to staff the material coordinator position. Shortly thereafter, the Union filed a grievance regarding the propriety of EMRE contracting out bargaining unit positions in this way.

It is undisputed that EMRE is permitted to hire independent contractors under the CBA. However, the Union claims that EMRE was not simply hiring an independent contractor. The Union claims EMRE was attempting to permanently fill bargaining unit positions with contractors, and

---

[3] Appx. at 56.

[4] Whether the person who departed was "core" or "non-core" does not impact our analysis.

the resulting attrition thereby undermines the longevity of the Union. EMRE maintains that its practice of contracting out work was consistent with the CBA and any resulting impact on the bargaining unit is irrelevant to whether it has violated the terms of the CBA. The Arbitrator considered the impact on the bargaining unit in adjudicating the resulting grievance. EMRE argues such consideration was improper and beyond the scope and terms of the CBA.

## B. The Collective Bargaining Agreement

The 2013 CBA between EMRE and ILEU generally governs this dispute. It sets "rates of pay, hours of employment, and other conditions of employment" of bargaining unit members at the Clinton Facility during the relevant period.[5] Most relevant to this dispute is the Article I § 2 Recognition Clause of the CBA in which

> [t]he Company recognizes the Union as the exclusive representative of all EMRE employees whose job classifications are listed in Exhibit II and who are based at the Clinton, New Jersey facility as covered by this Agreement for the purposes of collective bargaining with respect to rates of pay, hours of employment, and other conditions of employment as provided by the certification of the National Labor Relations Board.[6]

The CBA also governs the Company's hires of independent contractors and their work. The relevant provision allows the Company to "let independent contracts" as long as:

> during any period of time when an independent contractor is performing work of a type customarily performed by employees and employees qualified to perform such work together with all of the equipment necessary in the performance of such work are available in the

[5] *Indep. Lab. Emps.' Union, Inc.*, 2019 WL 3416897, at *1.
[6] Appx. at 77.

4

Company facilities, the Company may not because of lack of work demote or lay off any employee(s) qualified to perform the contracted work.[7]

The CBA also provides a mechanism for dispute resolution, including arbitration. As is customary, it states that arbitrators may not "enlarge, modify, rewrite, or alter any of the terms" of the CBA.[8]  Either party may initiate an arbitration.  Once resolved, the arbitrator's decision is "final and binding on the Company and the Union, unless it is contrary to law, and *shall conclusively determine the disputed question for the life of this Agreement, or any renewal or renewals thereof.*"[9]

### C. The Klein Award

In the award that is the subject of this appeal, Arbitrator Klein found that by "expressly limit[ing] layoffs or demotion[s] . . . 'during any period of time when an independent contractor is performing work of a type customarily performed by employees …' . . . Article XVIII [of the CBA] expressly limits contracting to a 'period of time.'"[10] In reaching that conclusion, the Arbitrator relied on the text of the Recognition Clause and Article XVIII of the CBA; prior statements of EMRE vice president R.L. Weeks and Project Manager Dan O'Rourke; as well as past awards in disputes between the Company and the Union.

Following the denial of a similar grievance brought by ILEU in 1977,[11] EMRE's vice president, R.L. Weeks, issued a letter assuring the Union that any future contracts between the Company and non-union personnel would "only be done when operations require, and in conjunction with, a combined program of employment and uprates [sic] of our own [union]

---

[7] *Id.* at 122.

[8] *Id.* at 86.

[9] *Id.* at 85–86 (emphasis added).

[10] *Id.* at 69.

[11] The Klein Award references this letter as coming in both 1977 and 1979. *Id.* at 56, 61. For consistency, this opinion will use the same date used by the District Court.

5

personnel."[12]  Weeks stressed the Company's policy regarding independent contracting by declaring, "I can state positively that there was not in this case, *nor will there be in the future*, any intent to erode the bargaining unit nor to limit the number of bargainable employees."[13]

These statements by Weeks were not the only Company communications Arbitrator Klein relied upon in resolving the current dispute.  She also considered a more recent Company position articulated by Project Manager Dan O'Rourke.  "[A]s employees have retired from the stockroom, they have been replaced with contractors. We were moving towards the fully contracting model that we had mentioned a number of times."[14]

A few years after Weeks' statement, the Union grieved EMRE's plan to contract out entry-level mailroom staff positions while Exxon—EMRE's parent corporation—underwent a long overhaul of the mail processing system.  The overhaul impacted EMRE and other companies affiliated with Exxon.[15]  The grievance was resolved in 1981.  There, Arbitrator Stark found that EMRE had failed to provide ILEU notice of the contracting as required by the controlling CBA.[16]  In reaching this conclusion, Arbitrator Stark wrote that Article XVIII "is not onerous" or a "very restrictive provision" and the parties should not read Article XVIII "in a highly legalistic manner."[17]  Ultimately, the Company's decision to let a contract for five months was affirmed.[18]  The parties disputed

---

[12] *Id.* at 56 (quoting Letter from R.L. Weeks, Vice President, EMRE, to ILEU (Aug. 5, 1977)).

[13] *Id.* (emphasis added).

[14] *Id*. at 58.

[15] *Id*. at 68.

[16] *Id.* (discussing the *Stark Award*).

[17] *See Indep. Lab. Emps.' Union, Inc.*, 2019 WL 3416897, at *2 (quoting the *Stark Award*).

[18] Arbitrator Stark found that the contract letting work to independent contractors was "the 'type of activity . . .' the parties intended to cover by Article XVIII." Appx. at 68.

a similar issue again in 1983 and that dispute was resolved by Arbitrator Florey.[19]

Like Arbitrator Stark, Arbitrator Florey found the hiring of independent contractors permissible because EMRE was able to demonstrate operational need. In reaching that conclusion, Arbitrator Florey posed a hypothetical of an impermissible situation where hiring independent contractors would replace a bargaining unit rather than respond to an operational need.[20] However, that concern did not preclude Florey from allowing the use of independent contractors in 1983 because "the use of [non-union] personnel [there] was in response to a true operational problem *and not designed to undermine the bargaining unit in violation of the recognition clause of the [CBA]*."[21] He concluded that "even with the broad language of Article XVIII," the CBA would not support "the position that [EMRE] need not hire any more persons into the bargaining unit so that [ILEU] would atrophy by attrition."[22]

Here, Arbitrator Klein considered the 1983 *Florey Award* as part of the history of the shop that was both relevant and helpful to resolving the current dispute. The Union took the same position in the arbitration leading to the *Florey Award*, that it is taking here. Specifically, the Union had objected to EMRE hiring independent contractors to reduce a backlog that developed during the installation of a new computer system.[23] The Union had been concerned with bargaining unit members being deprived of opportunities that could delay future promotion.

---

[19] *See ILEU v. EMRE* ("*Florey Award*"), Grievance No. WP-75, at 2 (Apr. 11 & 19, 1983) (Florey, Arb.). The record contains an incomplete copy of the *Florey Award*. (ECF No. 52-1). The parties provided the Court with a complete copy.

[20] *Id.* at 13.

[21] *Id.* (emphasis added). *See also Indep. Lab. Emps.' Union, Inc.*, 2019 WL 3416897, at *2.

[22] *See Florey Award.* at 13–14. *See also Indep. Lab. Emps.' Union, Inc.*, 2019 WL 3416897, at *2.

[23] Appx. at 68–69.

Arbitrator Klein distinguished EMRE's current position from the underlying circumstances addressed by Arbitrators Stark and Florey. In the previous arbitrations, the Arbitrators found that the independent contracts were let to address an *operational* problem or need of the Company. "Both Arbitrator Stark and Arbitrator Florey recognized the tension between the Company's need to contract for operational reasons and the Union's need to maintain the composition of its bargaining unit."[24] In the current award, Arbitrator Klein found EMRE "pursued an operational plan to replace employees with contractors in 'non-core' positions" as they left EMRE.[25] Although she did not find the Company specifically intended to undermine the bargaining unit, she concluded that the "focus on what [the Company] views as 'core' job families versus 'non-core' job families, which it plans to contract *permanently*, serves to undermine the composition and breadth of the bargaining unit and, by doing so, is not authorized by the [CBA]."[26]

II

The Labor Management Relations Act, 29 U.S.C. § 141 *et seq.*, gives district courts jurisdiction to review arbitration awards between employers and labor unions. We have appellate jurisdiction under 28 U.S.C. § 1291.

As we noted in the beginning, the standard of review of an arbitrator's decision is extremely deferential. Thus, we may only vacate an arbitration award where it was "procured by corruption, fraud, or undue means; where there was [evidence of] partiality or corruption in the arbitrators . . . ; where the arbitrators were guilty of misconduct . . . ; or . . . where the arbitrators exceeded their powers."[27] We also will not overturn an arbitration award unless we conclude there is a "manifest disregard of the agreement, totally unsupported by the

---

[24] *Id.* at 69.

[25] *Id.*

[26] *Id.* at 70 (emphasis added).

[27] 9 U.S.C. § 10(a).

8

principles of contract construction and the law of the shop. . . ."[28]

## III.

EMRE argues that the *Klein Award* did not draw its essence from the CBA and that the Arbitrator improperly relied on extrinsic evidence. EMRE also claims that Arbitrator Klein improperly resolved this grievance by applying her own brand of industrial justice rather than relying on the CBA. We disagree. As we explain below, Arbitrator Klein properly read the Recognition Clause as providing some limitation to the Company's ability to hire contracts. In addition, she properly relied upon the prior *Stark* and *Florey Awards* as well as statements made by Company managers in interpreting the CBA and resolving this grievance.

## A.

Our review of an arbitration award turns on whether it "draws its essence from the [CBA]. . . ."[29] This inquiry is not circumscribed by a rigid and mechanical examination of the text of the CBA. Long-established labor law does not allow us to take the view that "an employee's claim must fail unless he [or she] can point to a specific contract provision upon which the claim is founded."[30] Our narrow scope of review arises from the recognition of the realities of the relationship between labor and management. Too many unforeseeable contingencies may arise in an industrial setting for us to mechanically reject an arbitrator's interpretation of a collective bargaining agreement. Such agreements are often comprehensive resolutions of competing interests within the complex environment of a workplace that often has competing economic, managerial, and interpersonal dynamics.[31]

---

[28] *Citgo Asphalt Refining Co. v. Paper, Allied-Indus., Chem., & Energy Workers Int'l Union Local No. 2-991*, 385 F.3d 809, 816 (3d Cir. 2004) (internal citation omitted).
[29] *Id.* (internal citation omitted).
[30] *United Steelworkers of Am., v. Warrior & Gulf Navigation Co.*, 363 U.S. 574, 579 (1960).
[31] *Id.*

The Supreme Court recognized the need to achieve a workable balance in such an environment in deciding *United Steelworkers v. Warrior & Gulf Navigation Co.* There, the Court described the "common law of the shop."[32] Unlike other contractual relationships, the relationship between an employer and a labor union entering a labor agreement is unique because a relationship almost always exists between the employer and the union before the parties enter negotiations.[33] "Law of the shop" is a gap filler that necessarily arises from the impossibility of creating a CBA sufficient to regulate every aspect of the relationship between an employer and a union.[34] Moreover, arbitration plays its own role in developing the "law of the shop" since "[t]he processing of disputes through the grievance machinery is actually a vehicle by which meaning and content are given to the [CBA]."[35] Thus, an arbitrator must be able to look to the practices of the industry and the shop— including past arbitration agreements and company statements—in addition to a CBA in adjudicating a labor dispute. Accordingly, we uphold arbitration awards as long as "they are not in 'manifest disregard of the law' and can be rationally derived from the permissible sources of law."[36]

**B.**

EMRE claims the District Court erred in affirming the *Klein Award* because it does not draw its essence from the parties' CBA. We cannot agree with this rather myopic view of the limits of the CBA and the restrictions it places on this or any future arbitrator. EMRE asks us to focus solely on the

---

[32] *Id.* at 580 (internal citation omitted).

[33] *Id.*

[34] *Id.* "Gaps may be left to be filled in by reference to the practices of the particular industry and of the various shops covered by the agreement." *Id.* (balancing ". . .the compulsion to reach agreement. . .the breadth of the matters covered, as well as the need for a fairly concise and readable instrument . . . .").

[35] *Id.* at 581.

[36] *Virgin Islands Nursing Ass'n's Bargaining Unit v. Schneider*, 668 F.2d 221, 223 (3d Cir. 1981) (quoting *Ludwig Honold Mfg. Co. v. Fletcher*, 405 F.2d 1123, 1128 (3d Cir. 1969)).

2013 CBA between it and the Union. We agree that the 2013 CBA is certainly relevant to the current dispute. The Union correctly points out that its exclusive right to represent covered positions contained in the Recognition Clause becomes illusory if the Company can replace all bargaining unit members with contractors over time.[37] Moreover, we agree with Arbitrator Klein's conclusion that "[w]hile Article XVIII permits the Company to contract the work performed by these positions without express limitation, these positions remain covered by the [CBA and] . . . [a]s a result, both Article XVIII and the Recognition Clause prohibit the permanent contracting of these positions" is a plausible reading of the agreement, and we must therefore uphold her interpretation of the CBA.[38]

This Court and the Supreme Court have repeatedly explained that "[t]he labor arbitrator's source of law is not confined to the express provisions of the contract, as the industrial common law—the practices of the industry and the shop—is equally a part of the [CBA] although not expressed in it."[39] Thus, it was not only appropriate, it was necessary, for Arbitrator Klein to also consider the overall relationship between the Union and the Company and their unique history as part of the "law of the shop," as long as doing so did not violate an unambiguous contrary provision of the CBA. This award was not a clear violation of the restrictions and rights bargained for in the CBA.[40]

## C.

---

[37] Appx. at 60. "Permanently contracting positions covered by the Recognition Clause has the effect, over time, as additional positions are contracted permanently, of changing the scope of the Recognition Clause and potentially eroding both the coverage and size of the bargaining unit." *Id.* at 70.

[38] *Id.* at 70.

[39] *Ludwig,* 405 F.2d at 1131 (quoting *United Steelworkers of Am., v. Warrior & Gulf Navigation Co.*, 363 U.S. at 581–82.).

[40] The parties agreed in the CBA that previous arbitral decisions would be "final and binding" thus, it follows logically an arbitrator would be able to turn to those decisions in issuing his or her award. Appx. at 85–86.

11

Arbitrator Klein appropriately relied on the 1981 *Stark Award* and the 1983 *Florey Award*—both of which distinguished temporary contracting to meet operational need from permanent outsourcing and erosion of the bargaining unit in violation of the Recognition Clause. Given that history, Arbitrator Klein's conclusion here was not only plausible but reasonable. Rather than imposing "her own sense of justice" as EMRE argues, Arbitrator Klein thoughtfully and appropriately considered past statements of certain EMRE officials regarding outsourcing and interpreted the pertinent language in this CBA in that context.

We have held where an arbitrator's award deviates from the plain meaning of a provision it can be upheld if it can find "prior practices demonstrating relaxation of the literal language."[41] The 1977 statement from Vice President Weeks, "there was not in this case, nor will there be in the future, any intent to erode the bargaining unit nor limit the number of bargainable employees[,]" provides such language.[42] This award is therefore distinguishable from the award we reviewed in *Monongahela Valley Hospital v. United Steel Paper and Forestry Rubber Manufacturing Allied Industrial and Service Workers International Union AFL-CIO*.[43]

The dispute in *Monongahela Valley* arose when a bargaining unit member wanted to take a vacation that conflicted with a non-bargaining unit supervisor's preferred vacation time. The two employees could not be away at the same time, nor could they come to an agreement about who should get the vacation. Arbitration followed. There, the applicable CBA between the Union and the Hospital stated that the Hospital exclusively reserved the final right to allow vacation and to change vacation periods.[44] However, the

---

[41] *Akers Nat'l Roll Co. v. United Steel, Paper & Forestry, Rubber, Mfg., Energy, Allied Indus. & Serv. Workers Int'l Union*, 712 F.3d 155, 162 (3d Cir. 2013).

[42] Appx. at 56 (quoting Letter from R.L. Weeks, Vice President, EMRE, to ILEU (Aug. 5, 1977)).

[43] 946 F.3d 195 (3d Cir. 2019).

[44] The Union at Monongahela Valley Hospital represented about half of the Hospital's 1,100 employees. *Id.* at 197. The

*Monongahela Valley* Arbitrator reasoned that since the Hospital could always deny a bargaining unit member's vacation, it could impermissibly undermine the bargaining unit. The Arbitrator found that "'notwithstanding the Hospital's reservation of *exclusive rights* contained in Section 13[B](6)of the Agreement,' the CBA precluded the Hospital from using 'blackout' periods and prevented it from 'deny[ing] senior employees in the bargaining unit their desired vacation[ ] when there is no operating need.'"[45] The District Court vacated the award finding that it manifested plain disregard for the CBA and ignored the clear intentions of the parties.[46]

We affirmed the District Court because "the award in no rational way [drew] its essence from the CBA[] and the arbitrator . . . exceeded his authority under the CBA by dispensing his own brand of industrial justice."[47] The required deference did not preclude us from recognizing that we should not "rubber stamp an arbitrator's decision" when an award was entirely unsupported by the record.[48] We found the Arbitrator ignored the plain language of the CBA and exceeded his authority.

Here, EMRE also objects to the Arbitrator's reading of temporal restrictions into the CBA.[49] But Arbitrator Klein's award can be distinguished from the award in *Monongahela Valley* because Klein rested her decision largely upon the "law of the shop." In addition to relying on relevant statements by Company officials, she drew upon past awards which explicitly considered the operational needs of the Company.[50] Where the *Monongahela Valley* CBA unambiguously stated that the Hospital had "final and exclusive right to deny employees their

CBA provision in question "provides that [v]acation will, **so far as possible**, be granted at times most desired by employees; **but** the **final** right to allow vacation periods, and the right to change vacation periods[,] is exclusively reserved to the Hospital." *Id.* (emphasis in original).

[45] *Id.* at 198.

[46] *Id.* at 199.

[47] *Id.*

[48] *Id.* (citation omitted).

[49] **Appellant's Br. at 16.**

[50] *See Florey Award* at 13.

13

desired vacation,"[51] Arbitrator Klein found the EMRE-ILEU CBA did not unambiguously provide for permanent elimination of bargaining unit positions.[52]

Arbitrator Klein looked to the "law of the shop" and her decision is supported by it. The *Florey* and *Stark Awards* both addressed the "tension between the Company's need to contract for operational reasons and the Union's need to maintain the composition of the bargaining unit."[53] This is the same situation the parties found themselves in when the materials coordinator position was left vacant. Yet, the situation EMRE was facing in the 1970s and 1980s fundamentally differed from the situation faced by the 2010s. By then, EMRE had arguably begun to "pursue[] an operational plan to replace employees with contractors in 'non-core' positions . . . ."[54] Arbitrator Klein found there were bargaining unit positions—like the materials coordinator position at issue as well as waste water treatment positions—that EMRE had "not evinced a plan to fill [] with employees covered by the [CBA] at any point in the future."[55] Thus, she reasonably concluded that efforts to fill these positions indefinitely with non-union workers did not come from operational need similar to installing a new computer system or overhauling the mailroom. Rather, Arbitrator Klein reasoned that it was the result of planned understaffing of certain positions with the intent to fill them with independent contractors.[56] Arbitrator Klein properly followed precedent from past arbitrations between the Union and the Company. "Florey found the Company could not 'undermine the bargaining unit in violation of the recognition clause of the Agreement…' or to '…not hire anymore persons into the bargaining unit so that the Union would atrophy by attrition.'"

---

[51] *Monongahela Valley*, 946 F.3d at 198 (internal quotations omitted).

[52] Appx. at 70.

[53] *Id.* at 69. *See also id.* at 77.

[54] *Id.* at 69.

[55] *Id.*

[56] *Id.* ("The Company [sought] to retain an employee workforce consisting of 'core' employees while permanently contracting other 'non-core' positions . . . .").

[57] To the contrary, Arbitrator Klein produced a well-reasoned decision based on the long history of arbitrations between EMRE and ILEU and did not overstep her authority in doing so.

## IV.

For the reasons we have explained, we hold that the arbitration award resolving this dispute between EMRE and ILEU draws its essence from the CBA and the controlling "law of the shop," which includes past arbitration awards. The District Court found the award "withstands the minimal level of scrutiny appropriate for review of an arbitration award."[58] We agree and will affirm its well-reasoned decision.

---

[57] *Id.* at 61.
[58] *Indep. Lab. Emps.' Union, Inc.*, 2019 WL 3416897, at *9.

BIBAS, *Circuit Judge*, concurring in the judgment.

Judicial review of labor arbitration is deferential but not toothless. We must ensure that parties get the benefit of their bargain. Usually, that means deferring to the arbitrator: the parties bargained for her decision, not ours. But not always. When an arbitrator sets aside the text and rewrites the contract, we will reverse.

Here, the arbitrator approached that line but did not cross it. Because she misread Article XVIII, I cannot join Judge McKee's endorsement on that ground. Yet we must uphold an arbitral award if it has *any* toehold in the text. Here, two other provisions give it that toehold: the Recognition Clause plus the term incorporating past arbitral decisions. So I agree that we should affirm.

## I. THE ARBITRATOR MISREAD THE PLAIN TEXT OF ARTICLE XVIII

The central pillar of the arbitrator's decision, Article XVIII, is no support at all. The arbitrator read it as "*expressly limit[ing]* … contracting to a 'period of time.'" App. 69 (emphasis added). Not so. Far from imposing limits, that Article *empowers* Exxon to contract out work:

> The Company may let independent contracts.
>
> …
>
> However, during any period of time when an independent contractor is performing work …, the Company may not because of lack of work demote or lay off any employee(s) qualified to perform the contracted work.

App. 122.

The phrase "period of time" just puts a condition on contracting out: Exxon "may not … demote or lay off" a Union employee "during any period of time" when a contractor is working for it. That does not mean, as the arbitrator ruled, that Exxon must limit contracting out to a fixed period. The text lets Exxon hire contractors indefinitely, so long as it does not fire or demote qualified Union employees during that time. Thus, I cannot agree with Judge McKee that the arbitrator was right to "conclu[de] that '… Article XVIII … prohibit[s] the permanent contracting [out of certain] positions.'" McKee Op. 13 (quoting App. 70).

If this were a contract case, I would stop there and reverse the award. The specific contracting-out power in Article XVIII means what it says: Exxon may hire contractors. But labor arbitration is different. And our highly deferential standard of review requires us to uphold the award.

2

## II. THE RECOGNITION CLAUSE AND PAST DECISIONS SUPPORT THE AWARD

The arbitrator stretched the parties' bargain to its limit. But I may not overturn the award if it "even arguably constru[es] or appl[ies] the contract." *Major League Baseball Players Ass'n v. Garvey*, 532 U.S. 504, 509–10 (2001) (per curiam) (internal quotation marks omitted). Here, it does. There are two colorable textual bases for the arbitrator's decision: the Recognition Clause and the parties' agreement to treat arbitral awards as precedent.

The Recognition Clause "recognizes the Union as the exclusive representative of all [Exxon] employees." App. 77 (Art. I, §2). The arbitrator read this clause to prevent Exxon from permanently filling covered position with contractors. Otherwise, Exxon could steadily "erod[e] both the coverage and the size of the bargaining unit." App. 70. Supplanting Union members, she thought, would make the Union's exclusive role illusory.

This reading, though, is hardly obvious. Article XVIII is more specific than the Recognition Clause, so it should govern. Even so, the award "draws its essence from the collective bargaining agreement." *Ludwig Honold Mfg. Co. v. Fletcher*, 405 F.2d 1123, 1125 (3d Cir. 1969). So we must defer to it. *Cf. Monongahela Valley Hosp. v. United Steel Workers Int'l Union AFL-CIO*, 946 F.3d 195, 199 (3d Cir. 2019) (overturning an "award [that] in no rational way dr[e]w[] its essence from the [agreement]"). Thus, the arbitrator could and did find that

3

the Recognition Clause limited contracting out to preserve the Union's exclusive role.

The arbitrator properly supported this conclusion by looking to previous arbitral decisions. The parties agreed that, "for the life of this Agreement," arbitral awards would remain "final and binding" precedent. App. 85–86 (Art. VIII, § 7(B)). One such precedent is relevant. In 1983, the Union challenged Exxon's use of contractors to address a backlog of work. An arbitrator rejected this claim. But in doing so, he drew a line between permissible contracting out "in response to a true operational problem" and problematic hiring "designed to undermine the bargaining unit in violation of the recognition clause of the Agreement." *Indep. Lab'y Emps. Union v. ExxonMobil Rsch. & Eng'g*, Grievance No. WP-75, at 13 ¶ 27 (Apr. 11 & 19, 1983) (Florey Arb.). The parties' agreement makes this decision a precedent. So the arbitrator could and did rely on it to keep Exxon from eroding the bargaining unit here.

Finally, the arbitrator could and did consider the "law of the shop." Even when an arbitral award deviates from the most natural meaning of a contractual provision, it can find support in "prior practices demonstrating relaxation of the literal language." *Akers Nat'l Roll Co. v. United Steel Workers Union*, 712 F.3d 155, 162 (3d Cir. 2013) (internal quotation marks and emphasis omitted). Here, there is evidence from past practice. In 1979, Exxon's Vice President R.E. Weeks insisted that "there was not in this case, *nor will there be in the future*, any intent to erode the bargaining unit nor to limit the number of bargainable employees." App. 61 (emphasis added). This

4

extrinsic evidence buttresses the arbitrator's conclusion that Exxon cannot use contracting out to undermine the Union.

On this plausible reading, Exxon violated the agreement. Exxon admitted that its plan was to reduce the number of Union jobs "as employees have retired," in the course of "moving towards [a] fully contracting model." App. 58. But on the arbitrator's understanding, it cannot use contracting to do that.

\* \* \* \*

This case is at the very outer edge of our deference. The arbitral award is contrary to the fairest reading of the text. But the arbitrator here, unlike in *Monongahela*, did not just make it up. Because the award is plausible in light of the Recognition Clause, the term incorporating past arbitral awards, and the law of the shop, we must affirm.

COWEN, *Circuit Judge,* concurring in the judgment.

I join in the judgment for the reasons set forth in Judge Bibas's concurring opinion.